# FORT HALIFAX PACKING CO., INC. *v.* COYNE, DIRECTOR, BUREAU OF LABOR STANDARDS OF MAINE, ET AL.

No. 86–341.   Argued March 24, 1987—Decided June 1, 1987

2

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. WHITE, J., filed a dissenting opinion, in which REHNQUIST, C. J., and O'CONNOR and SCALIA, JJ., joined, *post*, p. 23.

*John C. Yavis, Jr.*, argued the cause for appellant. With him on the briefs were *Thomas M. Cloherty* and *Barry J. Waters*.

*Thomas D. Warren*, Assistant Attorney General of Maine, argued the cause for appellees. With him on the brief for appellee Coyne was *James E. Tierney*, Attorney General.*

JUSTICE BRENNAN delivered the opinion of the Court.

In this case we must decide whether a Maine statute requiring employers to provide a one-time severance payment to employees in the event of a plant closing, Me. Rev. Stat.

---

*Briefs of *amici curiae* urging reversal were filed for the United States by *Solicitor General Fried, Deputy Solicitor General Ayer, Christopher J. Wright, George R. Salem,* and *Allen H. Feldman;* and for the Chamber of Commerce of the United States by *Richard G. Moon, Linda D. McGill, John H. Rich III,* and *Stephen A. Bokat.*

Briefs of *amici curiae* urging affirmance were filed for the American Federation of Labor and Congress of Industrial Organizations by *Marsha S. Berzon* and *Laurence Gold;* and for the Employment Law Center et al. by *Joan M. Graff, Robert Barnes, John M. True, Patricia A. Shiu,* and *James Eggleston.*

Ann., Tit. 26, § 625–B (Supp. 1986–1987),[1] is pre-empted by either the Employee Retirement Income Security Act of 1974, 88 Stat. 832, as amended, 29 U. S. C. §§ 1001–1381 (ERISA), or the National Labor Relations Act, 49 Stat. 452, as amended, 29 U. S. C. §§ 157–158 (NLRA). The statute was upheld by the Maine Superior Court, Civ. Action No. CV81–516 (Oct. 29, 1982), and by the Maine Supreme Judicial Court, 510 A. 2d 1054 (1986). We noted probable jurisdiction, 479 U. S. 947 (1986), and now affirm.

## I

In 1972, Fort Halifax Packing Company (Fort Halifax or Company) purchased a poultry packaging and processing plant that had operated in Winslow, Maine, for almost two decades. The Company continued to operate the plant for almost another decade, until, on May 23, 1981, it discontinued operations at the plant and laid off all its employees except several maintenance and clerical workers. At the time

---

[1] The statute provides in pertinent part:

"2. Severance pay. Any employer who relocates or terminates a covered establishment shall be liable to his employees for severance pay at the rate of one week's pay for each year of employment by the employee in that establishment. The severance pay to eligible employees shall be in addition to any final wage payment to the employee and shall be paid within one regular pay period after the employee's last full day of work, notwithstanding any other provisions of law.

"3. Mitigation of severance pay liability. There shall be no liability for severance pay to an eligible employee if:

"A. Relocation or termination of a covered establishment is necessitated by a physical calamity;

"B. The employee is covered by an express contract providing for severance pay;

"C. That employee accepts employment at the new location; or

"D. That employee has been employed by the employer for less than 3 years."

Section 625–B(1)(A) defines "covered establishment" as a facility that employs 100 or more persons, while § 625–B(1)(F) defines "relocation" as the removal of all or substantially all operations at least 100 miles away from their original location.

of closing, over 100 employees were on the payroll. Forty-five had worked in the plant for over 10 years, 19 for over 20 years, and 2 for 29 years. Plaintiff's Supplementary Response to Employee List, Exhibit A (June 3, 1983). Following the closing, the Company met with state officials and with representatives of Local 385 of the Amalgamated Meat Cutters & Butcher Workmen of North America, which represented many of the employees who had worked in the plant. While Fort Halifax initially suggested that reopening the plant might be feasible if the union agreed to certain concessions in the form of amendments to the collective-bargaining agreement, ultimately the Company decided against resuming operations and to close the plant.

On October 30, 1981, 11 employees filed suit in Superior Court seeking severance pay pursuant to Me. Rev. Stat. Ann., Tit. 26, § 625–B (Supp. 1986–1987). This statute, which is set forth in n. 1, *supra*, provides that any employer that terminates operations at a plant with 100 or more employees, or relocates those operations more than 100 miles away, must provide one week's pay for each year of employment to all employees who have worked in the plant at least three years. The employer has no such liability if the employee accepts employment at the new location, or if the employee is covered by a contract that deals with the issue of severance pay. §§ 625–B(2), (3). Under authority granted by the statute, the Maine Director of the Bureau of Labor Standards also commenced an action to enforce the provisions of the state law, which action superseded the suit filed by the employees.[2]

---

[2] Section 625–B(5) of the Maine statute provides in relevant part:

"5. Suits by the director. The director is authorized to supervise the payment of the unpaid severance pay owing to any employee under this section. The director may bring an action in any court of competent jurisdiction to recover the amount of any unpaid severance pay. The right provided by subsection 4 to bring an action by or on behalf of any employee, and of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the director in an action under

The Superior Court, ruling on cross-motions for summary judgment, granted the Director's motion, holding that Fort Halifax is liable for severance pay under the statute. Civ. Action No. CV81–516 (Oct. 29, 1982). The Maine Supreme Judicial Court affirmed. 510 A. 2d 1054 (1986). The court rejected the Company's contention that the plant-closing statute was pre-empted by ERISA, holding that ERISA pre-empted only benefit plans created by employers or employee organizations. *Id.*, at 1059. It observed that the severance pay liability in this case results from the operation of the state statute, rather than from the operation of an employer-created benefit plan. *Ibid.* Therefore, reasoned the court, "[i]nasmuch as § 625–B does not implicate a plan created by an employer or employee organization, it cannot be said to be preempted by ERISA." *Ibid.* The court also rejected the argument that the state provision was pre-empted by the NLRA because it regulated conduct covered by either § 7 or § 8 of that statute. It found that the Maine statute applies equally to union and nonunion employees, and reflects "the state's substantial interest in protecting Maine citizens from the economic dislocation that accompanies large-scale plant closings." *Id.*, at 1062. As a result, the court found that eligible employees were entitled to severance pay due to the closure of the plant at Winslow.[3]

We hold that the Maine statute is not pre-empted by ERISA, not for the reason offered by the Maine Supreme Judicial Court, but because the statute neither establishes, nor requires an employer to maintain, an employee welfare benefit "plan" under that federal statute.[4] We hold further that

---

this subsection, unless the action is dismissed without prejudice by the director. . . . "

[3] Ninety-three employees of the plant are eligible for lump-sum payments ranging from $490 to $11,500. The total amount due is about $256,600. Affidavit of Xavier J. Dietrich, Exhibit A (Aug. 13, 1984).

[4] Because we hold that the obligation created by the Maine statute does not involve a plan, we do not address the State's alternative argument that, even if the law does establish a plan, it is not pre-empted by virtue of

the Maine law is not pre-empted by the NLRA, since it establishes a minimum labor standard that does not intrude upon the collective-bargaining process. As a result, we affirm the judgment of the Maine Supreme Judicial Court that the Maine statute is not pre-empted by either ERISA or the NLRA.

## II

Appellant's basic argument is that any state law pertaining to a type of employee benefit listed in ERISA necessarily regulates an employee benefit plan, and therefore must be pre-empted. Because severance benefits are included in ERISA, see 29 U. S. C. § 1002(1)(B), appellant argues that ERISA pre-empts the Maine statute.[5] In effect, appellant argues that ERISA forecloses virtually all state legislation regarding employee benefits. This contention fails, however, in light of the plain language of ERISA's pre-emption provision, the underlying purpose of that provision, and the overall objectives of ERISA itself.

## A

The first answer to appellant's argument is found in the express language of the statute. ERISA's pre-emption provision does not refer to state laws relating to "employee benefits," but to state laws relating to "employee benefit *plans*":

---

the exemption for plans "maintained solely for the purpose of complying with applicable . . . unemployment compensation or disability insurance laws." 29 U. S. C. § 1003(b)(3).

[5] Section 1002(1)(B) defines an employee welfare benefit plan as a plan that pays, *inter alia,* benefits described in 29 U. S. C. § 186(c). The latter section includes, *inter alia,* money paid by an employer to a trust fund to pay for severance benefits. Section 1002(1)(B) has been construed to include severance benefits paid out of general assets, as well as out of a trust fund. See *Holland* v. *Burlington Industries, Inc.,* 772 F. 2d 1140 (CA4 1985), summarily aff'd, 477 U. S. 901 (1986); *Gilbert* v. *Burlington Industries, Inc.,* 765 F. 2d 320 (CA2 1985), summarily aff'd, 477 U. S. 901 (1986); *Scott* v. *Gulf Oil Corp.,* 754 F. 2d 1499 (CA9 1985); 29 CFR § 2510.3–1(a)(3) (1986). See also discussion, *infra,* at 17–19.

"[T]he provisions of this subchapter . . . shall supersede any and all State laws insofar as they may now or hereafter relate to any *employee benefit plan* described in § 1003(a) of this title and not exempt under § 1003(b) of this title." 29 U. S. C. § 1144(a) (emphasis added).

We have held that the words "relate to" should be construed expansively: "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw* v. *Delta Airlines, Inc.*, 463 U. S. 85, 96–97 (1983). Nothing in our case law, however, supports appellant's position that the word "plan" should in effect be read out of the statute. Indeed, *Shaw* itself speaks of a state law's connection with or reference to a *plan*. *Ibid.* The words "benefit" and "plan" are used separately throughout ERISA, and nowhere in the statute are they treated as the equivalent of one another. Given the basic difference between a "benefit" and a "plan," Congress' choice of language is significant in its pre-emption of only the latter.

Thus, as a first matter, the language of the ERISA presents a formidable obstacle to appellant's argument. The reason for Congress' decision to legislate with respect to plans rather than to benefits becomes plain upon examination of the purpose of both the pre-emption section and the regulatory scheme as a whole.

### B

The second answer to appellant's argument is that preemption of the Maine statute would not further the purpose of ERISA pre-emption. In analyzing whether ERISA's pre-emption section is applicable to the Maine law, "as in any pre-emption analysis, 'the purpose of Congress is the ultimate touchstone.'" *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724, 747 (1985) (quoting *Malone* v. *White Motor Corp.*, 435 U. S. 497, 504 (1978)). Attention to purpose is particularly necessary in this case because the terms "employee benefit plan" and "plan" are defined only tautologically in the statute, each being described as "an employee welfare

benefit plan or employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan." 29 U. S. C. § 1002(3).

Statements by ERISA's sponsors in the House and Senate clearly disclose the problem that the pre-emption provision was intended to address. In the House, Representative Dent stated that "with the preemption of the field [of employee benefit plans], we round out the protection afforded participants by eliminating the threat of conflicting and inconsistent State and local regulation." 120 Cong. Rec. 29197 (1974). Similarly, Senator Williams declared: "It should be stressed that with the narrow exceptions specified in the bill, the substantive and enforcement provisions of the conference substitute are intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans." *Id.*, at 29933.

These statements reflect recognition of the administrative realities of employee benefit plans. An employer that makes a commitment systematically to pay certain benefits undertakes a host of obligations, such as determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records in order to comply with applicable reporting requirements. The most efficient way to meet these responsibilities is to establish a uniform administrative scheme, which provides a set of standard procedures to guide processing of claims and disbursement of benefits. Such a system is difficult to achieve, however, if a benefit plan is subject to differing regulatory requirements in differing States. A plan would be required to keep certain records in some States but not in others; to make certain benefits available in some States but not in others; to process claims in a certain way in some States but not in others; and to comply with certain fiduciary standards in some States but not in others.

We have not hesitated to enforce ERISA's pre-emption provision where state law created the prospect that an employer's administrative scheme would be subject to conflicting requirements.  In *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U. S. 504 (1981), for instance, we struck down a New Jersey statute that prohibited offsetting worker compensation payments against pension benefits.  Since such a practice is permissible under federal law and the law of other States, the effect of the statute was to force the employer either to structure all its benefit payments in accordance with New Jersey law, or to adopt different payment formulae for employees inside and outside the State.  The employer therefore was required to accommodate conflicting regulatory schemes in devising and operating a system for processing claims and paying benefits—precisely the burden that ERISA pre-emption was intended to avoid.

This point was emphasized in *Shaw, supra,* where we said with respect to another form of State regulation: "Obligating the employer to satisfy the varied and perhaps conflicting requirements of particular state fair employment laws . . . would make administration of a nationwide plan more difficult."  463 U. S., at 105, n. 25.  Such a situation would produce considerable inefficiencies, which the employer might choose to offset by lowering benefit levels.  As the Court in *Shaw* indicated, "ERISA's comprehensive pre-emption of state law was meant to minimize this sort of interference with the administration of employee benefit plans," *ibid.*, so that employers would not have to "administer their plans differently in each State in which they have employees."  *Id.*, at 105 (footnote omitted).

This concern about the effect of state regulation on the administration of benefit programs is reflected in *Shaw*'s holding that only disability programs administered separately from other benefit plans fall within ERISA's pre-emption exemption for plans maintained "for the purpose of complying with . . . disability insurance laws."  29 U. S. C. § 1003(b)(3).

To permit the exemption to apply to disability benefits paid under a multibenefit plan was held to be inconsistent with the purpose of ERISA's pre-emption provision:

> "An employer with employees in several States would find its plan subject to a different jurisdictional pattern of regulation in each State, depending on what benefits the State mandated under disability, workmen's compensation, and unemployment compensation laws. The administrative impracticality of permitting mutually exclusive pockets of federal and state jurisdiction within a plan is apparent." 463 U. S., at 107–108.

It is thus clear that ERISA's pre-emption provision was prompted by recognition that employers establishing and maintaining employee benefit plans are faced with the task of coordinating complex administrative activities. A patchwork scheme of regulation would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them. Pre-emption ensures that the administrative practices of a benefit plan will be governed by only a single set of regulations. See, *e. g.*, H. R. Rep. No. 93–533, p. 12 (1973) ("[A] fiduciary standard embodied in Federal legislation is considered desirable because it will bring a measure of uniformity in an area where decisions under the same set of facts may differ from state to state").

The purposes of ERISA's pre-emption provision make clear that the Maine statute in no way raises the types of concerns that prompted pre-emption. Congress intended pre-emption to afford employers the advantages of a uniform set of administrative procedures governed by a single set of regulations. This concern only arises, however, with respect to benefits whose provision by nature requires an ongoing administrative program to meet the employer's obligation. It is for this reason that Congress pre-empted state laws relating to *plans*, rather than simply to *benefits*. Only a plan embodies a set of

administrative practices vulnerable to the burden that would be imposed by a patchwork scheme of regulation.

The Maine statute neither establishes, nor requires an employer to maintain, an employee benefit *plan.* The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well *never* have to pay the severance benefits. To the extent that the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan.[6] Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims and paying benefits.

This point is underscored by comparing the consequences of the Maine statute with those produced by a state statute requiring the establishment of a benefit plan. In *Standard Oil Co. of California* v. *Agsalud,* 633 F. 2d 760 (CA9 1980), summarily aff'd, 454 U. S. 801 (1981), for instance, Hawaii had required that employers provide employees with a comprehensive health care plan. The Hawaii law was struck

---

[6] See *Martori Bros. Distributors* v. *James-Massengale,* 781 F. 2d 1349, 1358 (CA9) ("It is difficult to see how the making of one-time lump sum payments could constitute the establishment of a plan"), amended on other grounds, 791 F. 2d 799, cert. denied, 479 U. S. 949 (1986). Cf. *Donovan* v. *Dillingham,* 688 F. 2d 1367, 1373 (CA11 1982) ("A decision to extend benefits is not the establishment of a plan or program").

down, for it posed two types of problems.[7]   First, the employer in that case already had in place a health care plan governed by ERISA, which did not comply in all respects with the Hawaii Act.   If the employer sought to achieve administrative efficiencies by integrating the Hawaii plan into its existing plan, different components of its single plan would be subject to different requirements.   If it established a separate plan to administer the program directed by Hawaii, it would lose the benefits of maintaining a single administrative scheme.   Second, if Hawaii could demand the operation of a particular benefit plan, so could other States, which would require that the employer coordinate perhaps dozens of programs.   *Agsalud* thus illustrates that whether a State requires an existing plan to pay certain benefits, or whether it requires the establishment of a separate plan where none existed before, the problem is the same.   Faced with the difficulty or impossibility of structuring administrative practices according to a set of uniform guidelines, an employer may decide to reduce benefits or simply not to pay them at all.[8]

---

[7] In 1983, Congress amended ERISA to exempt from pre-emption certain provisions of the Hawaii Act in place before the enactment of ERISA, Haw. Rev. Stat. §§ 393–1 through 393–48 (1976 and Supp. 1984).   29 U. S. C. § 1144(b)(5).   The amendment did not exempt from pre-emption those portions of the law dealing with reporting, disclosure, and fiduciary requirements.

[8] The dissent draws support for its position from the the court's rejection in *Agsalud* of the argument that only state laws relating to plan administration, as opposed to plan benefits, are pre-empted by ERISA. *Post*, at 26.   The court's position, however, no more than acknowledges what we have said in our discussion, *supra:* state laws requiring the payment of benefits also "relate to a[n] employee benefit plan" if they attempt to dictate what benefits shall be paid under a plan.   To hold otherwise would create the prospect that plan administration would be subject to differing requirements regarding benefit eligibility and benefit levels — precisely the type of conflict that ERISA's pre-emption provision was intended to prevent.

By contrast, the Maine law does not put the employer to the choice of either: (1) integrating a state-mandated ongoing benefit plan with an existing plan or (2) establishing a separate plan to process and pay benefits under the plan required by the State. This is because there is no state-mandated benefit plan to administer. In this case, for instance, Fort Halifax found no need to respond to passage of the Maine statute by setting up an administrative scheme to meet its contingent statutory obligation, any more than it would find it necessary to set up an ongoing scheme to deal with the obligations it might face in the event that some day it might go bankrupt. The Company makes no contention that its statutory duty has in any way hindered its ability to operate its retirement plan in uniform fashion, a plan that pays retirement, death, and permanent and total disability benefits on an ongoing basis. App. 40. The obligation imposed by the Maine statute thus differs radically in impact from a requirement that an employer pay ongoing benefits on a continuous basis.

The Maine statute therefore creates no impediment to an employer's adoption of a uniform benefit administration scheme. Neither the possibility of a one-time payment in the future, nor the act of making such a payment, in any way creates the potential for the type of conflicting regulation of benefit plans that ERISA pre-emption was intended to prevent.[9] As a result, pre-emption of the Maine law would not

---

[9] Appellant notes that death benefits sometimes involve a one-time payment to beneficiaries, and that ERISA nonetheless defines an employee welfare benefit plan to include a program that pays such benefits. 29 U. S. C. § 1002(1). Thus, it contends, the fact that the Maine statute requires a single payment does not mean that the statute does not establish a plan. This argument, however, misunderstands what it is that makes a plan a plan. While death benefits may represent a one-time payment from the perspective of the beneficiaries, the employer clearly foresees the need to make regular payments to survivors on an ongoing basis. The ongoing, predictable nature of this obligation therefore creates the need for an administrative scheme to process claims and pay out benefits, whether those

serve the purpose for which ERISA's pre-emption provision was enacted.

## C

The third answer to appellant's argument is that the Maine statute not only fails to implicate the concerns of ERISA's pre-emption provision, it fails to implicate the regulatory concerns of ERISA itself. The congressional declaration of policy, codified at 29 U. S. C. § 1001, states that ERISA was enacted because Congress found it desirable that "disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of [employee benefit] plans." § 1001(a). Representative Dent, the House sponsor of the legislation, represented that ERISA's fiduciary standards "will prevent abuses of the special responsibilities borne by those dealing with plans." 120 Cong. Rec. 29197 (1974). Senator Williams, the Senate sponsor, stated that these standards would safeguard employees from "such abuses as self-dealing, imprudent investing, and misappropriation of plan funds." *Id.*, at 29932. The focus of the statute thus is on the administrative integrity of benefit plans—which presumes that some type of administrative activity is taking place. See, *e. g.*, H. R. Rep. No. 94–1785, p. 46 (1977) ("In electing deliberately to preclude state authority over these plans, Congress acted to insure uniformity of regulation with respect to their *activities*") (emphasis added); 120 Cong. Rec. 29197 (1974) (remarks of Rep. Dent) (disclosure and reporting requirements "will enable both participants and the Federal Government to monitor the plans' *operations*") (emphasis added); *id.*, at 29935 (remarks of Sen. Javits) (disclosure

---

benefits are received by beneficiaries in a lump sum or on a periodic basis. This is borne out by the fact that death benefits are included in appellant's retirement plan, with instructions on how eligibility is to be determined, benefit levels calculated, and disbursements made. App. 54–56. By contrast, appellant's statutory obligation did not prompt the establishment of any payment program, since there were no ongoing benefits to be paid.

meant to provide employees information "covering in detail *the fiscal operations* of their plan") (emphasis added).

The foregoing makes clear both why ERISA is concerned with regulating benefit "plans" and why the Maine statute does not establish one. Only "plans" involve administrative activity potentially subject to employer abuse. The obligation imposed by Maine generates no such activity. There is no occasion to determine whether a "plan" is "operated" in the interest of its beneficiaries, because nothing is "operated." No financial transactions take place that would be listed in an annual report, and no further information regarding the terms of the severance pay obligation is needed because the statute itself makes these terms clear. It would make no sense for pre-emption to clear the way for exclusive federal regulation, for there would be nothing to regulate. Under such circumstances, pre-emption would in no way serve the overall purpose of ERISA.

### D

Appellant contends that failure to pre-empt the Maine law will create the opportunity for employers to circumvent ERISA's regulatory requirements by persuading a State to require the type of benefit plan that the employer otherwise would establish on its own. That may be so under the rationale offered by the State Supreme Judicial Court, but that is not the rationale on which we rely today.

The Maine Supreme Judicial Court rested its decision on the premise that ERISA only pre-empts state regulation of pre-existing benefit plans established by the employer, and not state-mandated benefit plans. We agree that such an approach would afford employers a readily available means of evading ERISA's regulatory scope, thereby depriving employees of the protections of that statute. In addition, it would permit States to circumvent ERISA's pre-emption provision, by allowing them to require directly what they are forbidden to regulate. In contrast, our analysis of the pur-

pose of ERISA pre-emption makes clear why the mere fact that a plan is required by a State is insufficient to fend off pre-emption. The requirements imposed by a State's establishment of a benefit plan would pose a formidable barrier to the development of a uniform set of administrative practices. As *Standard Oil Co. of California* v. *Agsalud*, 633 F. 2d 760 (CA9 1980), illustrates, an employer would be put to the choice of operating separate ongoing benefit plans or a single plan subject to different regulatory requirements, and would face the prospect that numerous other States would impose their own distinct requirements—a result squarely inconsistent with the goal of ERISA pre-emption.

Appellant's arguments are thus well taken insofar as they are addressed to the reasoning of the court below. We have demonstrated, *supra,* however, they have no force with respect to a state statute that, as here, does not establish a plan. Such a statute generates no program activity that normally would be subject to ERISA regulation. Enforcement of the Maine statute presents no risk either that an employer will evade or that a State will dislodge otherwise applicable federal regulatory requirements. Nor is there any prospect that an employer will face difficulty in operating a unified administrative scheme for paying benefits. The rationale on which we rely thus does not create the dangers that appellant contends will result from upholding the Maine law.

Appellant also argues that its contention that the severance obligation under the Maine statute is an ERISA plan is supported by *Holland* v. *Burlington Industries, Inc.*, 772 F. 2d 1140 (CA4 1985), summarily aff'd, 477 U. S. 901 (1986), and *Gilbert* v. *Burlington Industries, Inc.*, 765 F. 2d 320 (CA2 1985), summarily aff'd, 477 U. S. 901 (1986). We disagree. Those cases hold that a plan that pays severance benefits out of general assets is an ERISA plan. That holding is completely consistent with our analysis above. There was no question in the *Burlington* cases, as there is in this

case, whether the employer had a "plan";[10] there was a "plan" and the only issue was whether the type of benefits paid by that plan are among those covered by ERISA. The precise question was simply whether severance benefits paid by a plan out of general assets, rather than out of a trust fund, should be regarded as employee welfare benefits under 29 U. S. C. § 1002.[11]

The courts' conclusion that they should be so regarded took into account ERISA's central focus on administrative integrity: if an employer has an administrative scheme for paying benefits, it should not be able to evade the requirements of the statute merely by paying those benefits out of general assets. Some severence benefit obligations by their nature necessitate an ongoing administrative scheme, but others do not. Those that do not, such as the obligation imposed in this case, simply do not involve a state law that "relate[s], to" an employee benefit "plan." 29 U. S. C. § 1144(a).[12]

---

[10] The employer had made a commitment to pay severance benefits to employees as each person left employment. This commitment created the need for an administrative scheme to pay these benefits on an ongoing basis, and the company had distributed both a Policy Manual and Employees' Handbook that provided details on matters such as eligibility, benefit levels, and payment schedules. 772 F. 2d, at 1143–1144, and n. 1; 765 F. 2d, at 323. The fact that the employer had not complied with the requirements of ERISA in operating this scheme therefore does not, as the dissent contends, *post*, at 25–26, mean that no such program for paying benefits was in existence.

[11] The question arose because § 1002(1)(B) provides that an employee welfare benefit plan includes a plan that provides benefits described in 29 U. S. C. § 186(c). The latter section lists, *inter alia*, money paid by an employer to a trust fund for severance benefits.

[12] Thus, if a State required a benefit whose regularity of payment necessarily required an ongoing benefit program, it could not evade pre-emption by the simple expedient of somehow formally characterizing the obligation as a one-time, lump-sum payment triggered by the occurrence of a certain contingency. It is therefore not the case, as the dissent argues, *post*, at 23, that a State could dictate the payment of numerous employee benefits "by simply characterizing them as non-'administrative.'" *Ibid.*

The *Burlington* cases therefore do not support appellant's argument.

### E

ERISA pre-emption analysis "must be guided by respect for the separate spheres of governmental authority preserved in our federalist system." *Alessi* v. *Raybestos-Manhattan, Inc.*, 451 U. S., at 522. The argument that ERISA pre-empts state laws relating to certain employee benefits, rather than to employee benefit *plans*, is refuted by the express language of the statute, the purposes of the preemption provision, and the regulatory focus of ERISA as a whole. If a State creates no prospect of conflict with a federal statute, there is no warrant for disabling it from attempting to address uniquely local social and economic problems.[13] Since the Maine severance payment statute raises no danger of such conflict, we hold that the statute is not preempted by ERISA.

### III

Appellant also contends that Maine's statute is pre-empted by the NLRA. In so arguing, the Company relies on the strand of NLRA pre-emption analysis that prohibits States from "imposing additional restrictions on economic weapons of self-help." *Golden State Transit Corp.* v. *City of Los Angeles*, 475 U. S. 608, 614 (1986).[14] Restriction on state activity in this area rests on the theory that pre-emption is necessary to further Congress' intent that "the conduct involved

---

[13] During the decade between 1971 and 1981, a total of 107 plants were closed in Maine, resulting in the direct loss of 21,215 jobs. Leighton, Plant Closings in Maine: Law and Reality, in Key Issues, No. 27, Plant Closing Legislation 1 (A. Aboud ed., 1984). Taking into account the multiplier effects of these job losses on the local communities, it is estimated that the total number of jobs lost in Maine during this period was 49,219. *Id.*, at 3. These losses were concentrated in the poorer counties of the State and in the lower wage industries, resulting in a significant burden on local public and private social service agencies. *Id.*, at 4.

[14] The National Labor Relations Act contains no express pre-emption provision.

be unregulated because [it should be] left 'to be controlled by the free play of economic forces.'" *Machinists* v. *Wisconsin Employment Relations Comm'n*, 427 U. S. 132, 140 (1976) (quoting *NLRB* v. *Nash-Finch Co.*, 404 U. S. 138, 144 (1971)).

Appellant concedes that, unlike cases in which state laws have been struck down under this doctrine, Maine has not directly regulated any economic activity of either of the parties. See, *e. g.*, *Machinists*, *supra* (State enjoined union members from continuing to refuse to work overtime); *Garner* v. *Teamsters*, 346 U. S. 485 (1953) (State enjoined union picketing). Nor has the State sought directly to force a party to forgo the use of one of its economic weapons. See, *e. g.*, *Golden State Transit*, *supra* (City Council conditioned taxicab franchise renewal on settlement of strike). Nonetheless, appellant maintains that the Maine law intrudes on the bargaining activities of the parties because the prospect of a statutory obligation undercuts an employer's ability to withstand a union's demand for severance pay.

This argument—that a State's establishment of minimum substantive labor standards undercuts collective bargaining—was considered and rejected in *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U. S. 724 (1985). That case involved a state law requiring that minimum mental health benefits be provided under certain health insurance policies. Appellants there presented the same argument that appellant makes in this case: "[B]ecause Congress intended to leave the choice of terms in collective-bargaining agreements to the free play of economic forces, . . . mandated-benefit laws should be pre-empted by the NLRA." *Id.*, at 748. The Court held, however, that the NLRA is concerned with ensuring an equitable bargaining process, not with the substantive terms that may emerge from such bargaining. "The evil Congress was addressing thus was entirely unrelated to local or federal regulation establishing minimum terms of employment." *Id.*, at 754. Such regulation provides protec-

tions to individual union and nonunion workers alike, and thus "neither encourage[s] nor discourage[s] the collective-bargaining processes that are the subject of the NLRA." *Id.*, at 755. Furthermore, pre-emption should not be lightly inferred in this area, since the establishment of labor standards falls within the traditional police power of the State. As a result, held the Court: "When a state law establishes a minimal employment standard not inconsistent with the general legislative goals of the NLRA, it conflicts with none of the purposes of the Act." *Id.*, at 757. It is true that the Maine statute gives employees something for which they otherwise might have to bargain. That is true, however, with regard to any state law that substantively regulates employment conditions. Both employers and employees come to the bargaining table with rights under state law that form a "'backdrop'" for their negotiations. *Ibid.* (quoting *Taggart* v. *Weinacker's, Inc.*, 397 U. S. 223, 228 (1970) (concurring opinion)). Absent a collective-bargaining agreement, for instance, state common law generally permits an employer to run the workplace as it wishes. The employer enjoys this authority without having to bargain for it. The parties may enter negotiations designed to alter this state of affairs, but, if impasse is reached, the employer may rely on pre-existing state law to justify its authority to make employment decisions; that same state law defines the rights and duties of employees. Similarly, Maine provides that employer and employees may negotiate with the intention of establishing severance pay terms. If impasse is reached, however, pre-existing state law determines the right of employees to a certain level of severance pay and the duty of the employer to provide it. Thus, the mere fact that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption, for "there is nothing in the NLRA . . . which expressly forecloses all state regulatory power with respect to those issues . . . that may be the

subject of collective bargaining." *Malone* v. *White Motor Corp.*, 435 U. S. 497, 504–505 (1978).

Appellant maintains that this case is distinguishable from *Metropolitan Life.* It points out that, unlike *Metropolitan Life*, the statutory obligation at issue here is optional, since it applies only in the absence of an agreement between employer and employees. Therefore, the Company argues, the Maine law cannot be regarded as establishing a genuine minimum labor standard. The fact that the parties are free to devise their own severance pay arrangements, however, strengthens the case that the statute works no intrusion on collective bargaining. Maine has sought to balance the desirability of a particular substantive labor standard against the right of self-determination regarding the terms and conditions of employment. If a statute that permits *no* collective bargaining on a subject escapes NLRA pre-emption, see *Metropolitan Life*, surely one that permits such bargaining cannot be pre-empted.[15]

We therefore find that Maine's severance payment law is "a valid and unexceptional exercise of the [State's] police power." *Metropolitan Life*, 471 U. S., at 758. Since "Congress developed the framework for self-organization and collective bargaining of the NLRA within the larger body of state law promoting public health and safety," *id.*, at 756, the Maine statute is not pre-empted by the NLRA.[16]

---

[15] Appellant also contends that, unlike the statute in *Metropolitan Life*, the Maine law does not fall equally upon union and nonunion employees. Nonunion employers, it argues, are free unilaterally to escape their statutory obligation by establishing severance payment levels, while unionized employers must engage in collective bargaining in order to achieve the same result. Any difference in the ease of establishing alternative severance payment obligations, however, flows not from the statute, but from the basic fact that a nonunion employer is freer to set employment terms than is a unionized employer.

[16] We also find no support for an argument of pre-emption under the rule established in *San Diego Building Trades Council* v. *Garmon*, 359 U. S. 236 (1959), since the Maine statute does not purport to regulate any con-

## IV

We hold that the Maine severance pay statute is not preempted by ERISA, since it does not "relate to any employee benefit plan" under that statute. 29 U. S. C. § 1144(a). We hold further that the law is not pre-empted by the NLRA, since its establishment of a minimum labor standard does not impermissibly intrude upon the collective-bargaining process. The judgment of the Maine Supreme Judicial Court is therefore

*Affirmed.*

JUSTICE WHITE, with whom THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE SCALIA join, dissenting.

The Court rejects appellant's pre-emption challenge to Maine's severance pay statute by reasoning that the statute does not create a "plan" under ERISA because it does not require an "administrative scheme" to administer the payment of severance benefits. By making pre-emption turn on the existence of an "administrative scheme," the Court creates a loophole in ERISA's pre-emption statute, 29 U. S. C. § 1144, which will undermine Congress' decision to make employee-benefit plans a matter of exclusive federal regulation. The Court's rule requiring an established "administrative scheme" as a prerequisite for ERISA pre-emption will allow States to effectively dictate a wide array of employee benefits that must be provided by employers by simply characterizing them as non-"administrative." The Court has also chosen to ignore completely what precedent exists as to what constitutes a "plan" under ERISA. I dissent because it is incredible to believe that Congress intended that the broad pre-emption provision contained in ERISA would depend upon the extent to which an employer exercised administrative foresight in preparing for the eventual payment of employee benefits.

---

duct subject to regulation by the National Labor Relations Board. See *Metropolitan Life Ins. Co.* v. *Massachusetts,* 471 U. S., at 748–749.

ERISA pre-empts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan . . . ." 29 U. S. C. § 1144. Congress defined an "employee welfare benefit plan" as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or an employee organization" and which provides certain benefits, including severance pay. 29 U. S. C. § 1002(1). See *Gilbert* v. *Burlington Industries, Inc.*, 765 F. 2d 320, 325 (CA2 1985), summarily aff'd, 477 U. S. 901 (1986). A state law "which requires employers to pay employees specific benefits clearly 'relate[s] to' benefit plans" as contemplated by ERISA's pre-emption provision. *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 97 (1983). I would have thought this to be the end of the pre-emption inquiry. Here, the Maine statute clearly creates an employee benefit plan, and having *created* an ERISA plan, the statute plainly "relates to" such a plan. The Maine Supreme Judicial Court, in effect, acknowledged as much, but held that Maine's statute was not pre-empted by ERISA because it was created by the state legislature instead of by a private employer. Apparently recognizing the flaw inherent in this reasoning, the majority nevertheless struggles to achieve its desired result by asserting that the statute does not create a "plan" because it does not require an employer to establish an administrative scheme. I cannot accept this conclusion.

First, § 1002(1) establishes no requirement that a "plan" meet any specific formalities or that there be some policy manual or employee handbook to effectuate it. Cf. *ante*, at 14–15, n. 9. In reading such a requirement into § 1002(1), the majority ignores the obvious: when a Maine employer is called upon to discharge its legislatively mandated duty under the severance pay statute, the funds from which it pays the benefits do not materialize out of thin air. The Maine Legislature has *presumed*, as it is so entitled, that employers will comply with the dictates of the statute's requirements. That an employer's liability is contingent upon an

event that may never happen does not make the plan that the legislature has imposed upon employers any less of a plan. And that there may be imprudent employers who either are unaware of the severance pay statute or order their business affairs as if the statute's obligations do not exist—and it is upon the behavior of this class of employers that the majority seemingly relies in concluding that the severance pay statute does not embody an "administrative scheme"—in no way supports the remarkable conclusion that the statutory obligations do not constitute a plan for the payment of severance benefits.

Second, in concluding that Maine's statute does not establish a "plan" as contemplated by ERISA, the Court overrules, *sub silentio*, recent decisions of this Court. *Gilbert* v. *Burlington Industries, Inc.*, *supra*, involved an employer's policy to pay severance benefits to employees who were involuntarily terminated. The employer had no separate fund from which to make severance pay payments, and, of particular note, there was virtually no "administrative scheme" to effectuate the program: "The granting or denial of severance pay was automatic upon termination. Plaintiffs [employees] allege that Burlington never sought to comply with ERISA respecting its severance pay policy. That is, they claim that: it never published or filed an annual report, a financial statement, a plan description or a statement of plan modifications; it did not designate a fiduciary for the plan or inform employees of their rights under ERISA and the plan; there was no established claims procedure; and, apart from the company's 'open door' grievance policy, there was no established appeals procedure." *Gilbert*, 765 F. 2d, at 323. The employees and numerous *amici* claimed that "a promise or agreement to pay severance benefits, without more, does not constitute a welfare benefit plan within the meaning of ERISA." *Id.*, at 324. The Second Circuit rejected this contention, *id.*, at 325, and we summarily affirmed, 477 U. S. 901 (1986). See

also *Holland* v. *Burlington Industries, Inc.*, 772 F. 2d 1140 (CA4 1985), summarily aff'd, 477 U. S. 901 (1986).

The Court characterizes *Standard Oil Co. of California* v. *Agsalud*, 633 F. 2d 760, 766 (CA9 1980), summarily aff'd, 454 U. S. 801 (1981), as holding that ERISA pre-empted Hawaii's health care statute because it impaired employers' ability to "structur[e] [their] administrative practices according to a set of uniform guidelines." *Ante,* at 13. But that case involved more than administrative uniformity. Indeed, in *Agsalud*, the Ninth Circuit expressly rejected the argument that ERISA was concerned only with the administration of benefit plans, not state statutes which require employers to provide particular employee benefits: "Appellants in the district court argued that since ERISA was concerned primarily with the administration of benefit plans, its provisions were not intended to prevent the operation of laws like the Hawaii Act pertaining principally to benefits rather than administration. There is, however, nothing in the statute to support such a distinction between the state laws relating to benefits as opposed to administration." 633 F. 2d, at 765. The Ninth Circuit held that the Hawaii Act "directly and expressly regulates employers and the type of benefits they provide employees. It must 'relate to' employee benefit plans within the meaning of ERISA's broad pre-emption provision . . . ." *Id.,* at 766. Representatives of the State of Hawaii appealed to this Court, No. 80–1841, claiming, *inter alia,* that the State's police power permits it to require employers to provide certain employee benefits, and that Hawaii's statute "in no way conflicts with any substantive provision in ERISA, since that statute requires no benefits at all." Juris. Statement, O. T. 1981, No. 80–1841, p. 7. We disagreed and summarily affirmed. 454 U. S. 801 (1981).

The Court's "administrative-scheme" rationale provides States with a means of circumventing congressional intent, clearly expressed in § 1144, to pre-empt all state laws that relate to employee benefit plans. For that reason, I dissent.