**Dr. Matthew MERKL, Plaintiff,**

v.

**BLUE CROSS AND BLUE SHIELD OF MASSACHUSETTS, INC., Defendant.**

**Civil Action No. 98–10379–MEL.**

United States District Court, D. Massachusetts.

Sept. 2, 1998.

Maurice M. Cahillane, Jr., Egan, Flanagan & Cohen, PC, Springfield, MA, for Matthew Merkl, Plaintiff.

Joseph D. Halpern, Blue Cross and Blue Shield of Mass., Law Department, Boston, MA, for Blue Cross and Blue Shield of Mass, Inc., Defendant.

*MEMORANDUM AND DECISION*

LASKER, District Judge.

Matthew Merkl, M.D. challenges the refusal by his former employer, Blue Cross and Blue Shield of Massachusetts, Inc. (BCBS), to pay severance benefits upon the termination of his employment. Dr. Merkl asserts a state law claim for breach of BCBS's "Physician Contractual Agreement Policy" (the "original contract"), and a second claim under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* (ERISA), based on the same document.

BCBS moves to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1), asserting that Dr. Merkl's contractual arrangement at the time of termination was not an ERISA plan, and that this court therefore lacks subject matter jurisdiction over the ERISA claim, which undisputedly provides the sole basis for federal jurisdiction. BCBS's primary argument is that an alleged collective bargaining agreement (the "CBA") actually superseded the original contract prior to Dr.

Merkl's termination, and that the agreement is not covered by ERISA. The fallback argument is that even if the original contract survived the CBA, it was not an ERISA plan.

I conclude that the collective bargaining agreement provides that the severance provision of the original contract governs. I find, however, for reasons other than those articulated by BCBS, that the original contract was not an ERISA plan, and that accordingly this court lacks subject matter jurisdiction.

## I.

Dr. Merkl was employed as a physician in BCBS's Health Centers Division through late 1997 or early 1998. Though the parties differ in their characterizations of the time of and reasons for Dr. Merkl's termination, it suffices to note that the termination was closely related to the December, 1997 acquisition of the Health Centers Division by MedPartners, Inc., an outside company not involved in this litigation. The Complaint asserts that Dr. Merkl's employment was governed at the time of his termination by the original contract—the BCBS "Health Centers Division Physician Contractual Agreement Policy," and that the contract entitled Dr. Merkl to severance pay. The relevant provision, set forth here in Appendix A, states that BCBS may terminate a physician at any time upon a reduction in staff required by a decline in the volume of patient services, and includes sub-provision (e) granting severance to covered physicians.

BCBS refused to provide Dr. Merkl severance or any other form of payment associated with his termination. Dr. Merkl contends that the sale of the Health Centers Division itself constituted a "reduction in staff" sparked by a "decline in volume of services," and that therefore, as an employee with more than six years service, he was entitled to severance in the amount of twelve months base salary.

BCBS acknowledges that Dr. Merkl was covered by the original contract through October, 1997. However, it disputes that its obligations under the contract survived a collective bargaining agreement entered into by the physician's union (of which Dr. Merkl was a part) and BCBS in October, 1997. At that time, in apparent anticipation of the impending acquisition by MedPartners, BCBS agreed to the terms of a collective bargaining proposal by the union. The CBA includes a provision that states in relevant part:

> Physicians represented by [the union] who have executed five-year long-term contract agreements shall be entitled to severance pay in two equal installments during December of 1997 and March of 1998 (provided they are employed by MedPartners or have been involuntarily terminated by MedPartners), subject to the following: (1) termination by [BCBS] prior to January 1, 1998; (2) such physician has released [BCBS] from any obligations it might have for severance pay and any other claims under the Physician Contractual Agreement; (3) the [union] has agreed to this severance in lieu of any severance which it claims may have been collectively bargained; and (4) the physician accepts employment with MedPartners (or a professional corporation affiliated with MedPartners) and commences such employment; ...

> Subject to the above, severance will be paid according to the following schedule:
> a. Less than four (4) years of total service = fourteen (14) weeks base pay;
> b. Four (4) to six (6) years of total service = twenty-one (21) weeks base pay;
> c. More than six (6) years of total service = twenty-eight (28) weeks base pay.

BCBS argues that the CBA superseded the original contract, effectively annulling any obligation to pay severance BCBS might have had under the contract, and that neither the CBA, nor the original contract, is or was an ERISA plan.

## II.

*Which contractual arrangement governed?*

■ As to the threshold question of which contractual arrangement governed at the time of Dr. Merkl's termination, I conclude that the original contract controlled. The record contains nothing to support BCBS's contention that the CBA superseded the

original contract with respect to severance. Indeed, the plain language of the CBA is to the contrary, requiring, among other things, that a physician seeking severance under the CBA have "released [BCBS] from any obligations it might have for severance pay and any other claims under the Physician Contractual Agreement." From the language of the CBA, it appears that BCBS and the union contemplated that the severance provision of the original contract would survive.

Moreover, it is worth noting that BCBS has submitted no evidence that the CBA was ever actually ratified and thereby made effective by union members. The CBA expressly states it "is contingent upon the ratification by physicians represented by the [union]." Therefore, even if the CBA severance provision were less clearly susceptible to the above interpretation, Dr. Merkl's allegations in support of the original contract's application would not be meaningfully undermined by BCBS's CBA-related submissions.

*Was the original contract an ERISA plan?*

 Severance policies or plans may be covered by ERISA. However, the Supreme Court has set limits on such coverage. In *Fort Halifax Packing Co., Inc. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), the Court held that an arrangement or mandate to make a lump sum severance payment upon the occurrence of a single event is not a "plan" under ERISA. Presented with a state statute requiring severance payments upon plant closings, the Court stated that:

> The requirement of a one-time, lump-sum payment triggered by a single event requires no administrative scheme whatsoever to meet the employer's obligation. The employer assumes no responsibility to pay benefits on a regular basis, and thus faces no periodic demands on its assets that create a need for financial coordination and control. Rather, the employer's obligation is predicated on the occurrence of a single contingency that may never materialize. The employer may well *never* have to pay the severance benefits. To the extent that

the obligation to do so arises, satisfaction of that duty involves only making a single set of payments to employees at the time the plant closes. To do little more than write a check hardly constitutes the operation of a benefit plan. Once this single event is over, the employer has no further responsibility. The theoretical possibility of a one-time obligation in the future simply creates no need for an ongoing administrative program for processing claims *and paying benefits.*

482 U.S. at 12, 107 S.Ct. 2211 (emphasis in original; note omitted).

The First Circuit has applied the *Fort Halifax* exception most recently in *Belanger v. Wyman–Gordon Co.,* 71 F.3d 451 (1st Cir. 1995). There it held that an early retirement package requiring only mechanical decision making and no continuing obligations of either an administrative or a financial nature did not constitute an ERISA plan. The Court found that the company's series of offers to employees:

> hinged on a purely mechanical determination of eligibility and, if accepted, required no complicated administrative apparatus either to calculate or to distribute the promised benefit. The offers pivoted on a single, time-specific event. . . . The bottom line is that the company did no more than propose to write a single check to each eligible employee who accepted an early retirement offer.

*See also Kulinski v. Medtronic Bio–Medicus, Inc.,* 21 F.3d 254 (8th Cir.1994) (severance plan involving one-time payment not covered by ERISA); *Wells v. General Motors Corp.,* 881 F.2d 166 (5th Cir.1989) (procedure by which employees electing to cease working at the plant would automatically receive a one-time lump payment not an ERISA plan), *cert. denied,* 495 U.S. 923, 110 S.Ct. 1959, 109 L.Ed.2d 321 (1990).

While the First Circuit has acknowledged that the application of *Fort Halifax* and its progeny sometimes involves hairsplitting,[1] the original contract in this case presents no

---

**1.** *See Simas v. Quaker Fabric Corp. of Fall River,* 6 F.3d 849, 853 (1st Cir.1993) (weighing similarities and differences of Massachusetts statute with

Maine statute in *Fort Halifax* "a matter of degrees, but under *Fort Halifax* degrees are crucial").

such difficulty. In the words of the *Belanger* court, "[i]f this is not *Fort Halifax* redux, it is sufficiently close to the *Fort Halifax* model that it falls outside ERISA's sphere."

As an initial point, the plaintiff is correct that sub-provision (e) of the contract's paragraph 8, which states that "[s]everance will be provided according to [a fixed] schedule for [covered] physicians," should be read as separate and distinct from the rest of the paragraph. *See* Appendix A. Although sub-provision (e) is clumped physically with sub-provisions (a) through (d), it concerns the grant of a substantive right under the contract (severance), while (a) through (d) merely set forth procedural steps. The distinction is significant, and refutes BCBS's principal argument that the substance of paragraph 8, which provides that, in the event of a staff reduction, "the following *procedure* will apply, *if determined by [BCBS] to be appropriate*," (emphases added), applies equally to all five sub-provisions, thereby granting BCBS the power not to pay severance at all. It would not be reasonable to construe, simply because of the positioning of sub-provision (e) within paragraph 8, the grant of a substantive right as a procedural step which the employer could unilaterally determine not to implement.[2]

The problem, however, for Dr. Merkl, is that the balance of his interpretation of the contract does not make sense. The contract is in fact much more straightforward than the array of arguments presented would indicate.

In an attempt to demonstrate that the *Fort Halifax* rule does not apply to the original contract, Dr. Merkl makes three arguments. First, he contends that sub-provisions (a) through (d), which expressly grant BCBS broad discretion, have to do with determinations of eligibility for severance. This is not the case—(a) through (d) do not concern severance eligibility, but rather address how BCBS would identify, in the case of a reduction in staff, which particular employees should be terminated. The mere fact that payment is automatic for those selected for

lay-off does not alter the fundamental purpose and substance of procedures (a) through (d).

Paragraph 8 establishes one of the several reasons for which a physician under contract may be terminated—specifically, a need to reduce staff precipitated by a decline in the volume of patients. It goes on to provide that if indeed such a reduction is required, then certain procedures, namely (a) through (d), will apply, as long as they are "determined by [BCBS] to be appropriate." Procedures (a) through (d) spell out who will be terminated, in what order, and upon whose final review. Sub-provision (e) then entitles whoever ultimately is selected for termination a virtually automatic severance payment, with the sole "eligibility determination" being a purely mechanical calculation as to number of years of service. As in *Belanger*, as soon as an employee is identified for termination, BCBS is obligated under the plain terms of the contract to pay a lump-sum payment, the only question here being which particular lump-sum the employee is owed.

Dr. Merkl next argues that (e) grants BCBS non-mechanical decision making authority as to the number of months worth of salary a covered physician will be paid. The plain language of (e) reads otherwise. BCBS has no discretion as to how much to pay. The payment amount is determined strictly according to the number of years of service. The only figuring to be done by BCBS is a simple mathematical calculation requiring no administrative scheme whatsoever.

Dr. Merkl argues in the alternative that sub-provision (e) requires payment over a series of months, with the number of months dependent on a physician's total years of service. While the plain language and format of (e) belies this interpretation, even if it had merit, the mere obligation to pay the severance over a period of time would not carry the day. *See Wells*, 881 F.2d at 176 (employer's grant of one-time payment in exchange for resignation not an ERISA plan, as program "was not ongoing, nor was there

---

**2.** Ironically, BCBS's argument, were it successful, would benefit Dr. Merkl in the context of the present, jurisdictional motion, as that kind of

discretion would likely render paragraph 8 an ERISA plan.

any need for continuing administration of the payment program [even considering that] employees could elect a two-year installment payment option").

None of the plaintiff's construction arguments is persuasive. The plain language and organization of paragraph 8 provide for an automatic, one-time, lump-sum payment to those covered physicians terminated in response to a decline in volume of services. Such an arrangement falls squarely into the *Fort Halifax* exception to the general rule that severance packages are covered by ERISA.

\* \* \* \* \* \*

Accordingly, BCBS's motion to dismiss is allowed, and the complaint is dismissed for lack of subject matter jurisdiction.

### APPENDIX A

**Termination of a Five Year Agreement by [BCBS].** [BCBS] may terminate a physician immediately at any time [upon]:

. . . .

8. [BCBS's] determination that a decline in volume of services requires a reduction in staff who are under a long-term contractual agreement. In the event of such a reduction in staff, the following procedure will apply, if determined by [BCBS] to be appropriate:

(a) Health Center Division senior management will review specialty areas targeted for reduction;

(b) Full and part-time physicians who are members of targeted specialty or subspecialty areas and who are not under a long-term contractual agreement will be relieved of responsibility first, in an order to be determined at the discretion of [BCBS];

(c) In the event that sufficient reduction is not achieved by (b) above, senior management will further reduce physician staffing in targeted specialty and subspecialty areas by considering both seniority and the most recent three years (sic) performance reviews of the individuals in the targeted specialty and subspecialty areas. Individuals with the overall poorest performance will be terminated without regard to seniority. If performance is equivalent among all or several members of the staff, then termination for those individuals will be in order of reverse seniority. The determination of how much reduction in staffing is necessary will be made at the discretion of [BCBS].

(d) Senior management decisions will be reviewed with the Management Review Committee prior to implementation;

(e) Severance will be provided according to the following schedule for physicians under a long-term contractual agreement:

(1) Less than 4 years of total service = 6 months base salary;

(2) Four (4) to 6 years of total service = 9 months base salary;

(3) More than years of total service = 12 months base salary.