EMPLOYERS RESOURCE MANAGE-
MENT COMPANY, INC. and All–Ameri-
can Professional Services, Inc., Plain-
tiffs,

v.

Charles G. JAMES, Chairman, Robert P.
Joyner, William E. O'Neill, Commission-
ers, Lawrence D. Tarr, Chief Deputy
Commissioner, Robert E. Dely, and Su-
san B. Potter, Deputy Commissioners of
the Workers' Compensation Commission
of the Commonwealth of Virginia, De-
fendants.

Civ. A. No. 3:93cv687.

United States District Court,
E.D. Virginia,
Richmond Division.

June 2, 1994.

John D. Epps, Steven W. Morris, LeClair,
Ryan, Joynes, Epps & Framme, Richmond,
VA, Allan J. Graf, Robert W. Ridley, Farmer
& Ridley, Los Angeles, CA, for plaintiffs.

Teresa C. Manning, Asst. Atty. Gen., Of-
fice of the Atty. Gen., Richmond, VA, for
defendants.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

Having stipulated the relevant facts, the parties have submitted this action for decision on cross-motions for summary judgment. The dispositive issue is whether provisions of the Virginia's Workers' Compensation statutes which require employers to provide security for the payment of occupational injury and illness benefits are preempted by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.* For the reasons set forth below, the court finds that the challenged provisions of state law are not preempted by ERISA and therefore grants the defendants' motion for summary judgment and denies the plaintiffs' motion for summary judgment.

### STATEMENT OF FACTS

The issues raised by the claims of preemption must be considered in context. To that end, it is necessary briefly to set forth the facts respecting the relationship between Employers Resource Management Company, Inc. ("ERM") and All–American Professional Services, Inc. ("All–American") and the benefit plan at issue and then to review the facts which prompted the institution of this action.

### A. The Relationship Between ERM and All–American

ERM is a Virginia corporation in the business of providing "co-employment services" on a long-term basis to its client "co-employers," including All–American which is a Virginia corporation in the business of leasing workers on a temporary or short-term basis to other companies. The somewhat unusual business relationship between ERM and All–American is established by a document entitled the "Co–Employment Agreement."

All–American hires individuals who wish to serve as temporary employees, secures work assignments for them and then assigns them to work for other companies which actually direct the temporary employee's work. ERM's sole raison d'etre is to provide its clients with "co-employment services," a euphemism for establishing and administering employee benefit plans. In essence, the purpose of this business relationship is to allow All–American's clients to use the services of temporary employees without having the responsibility for benefits, taxes and administration which usually attend the traditional employment relationship. It also allows All–American contractually to shift the responsibility for providing and administering those obligations to ERM in return for fees paid to ERM. The complaint alleges that the allocation of responsibilities in this fashion provides substantial economic savings to companies such as All–American and to its clients.

The allocation of responsibilities between ERM and All–American is accomplished by the Co–Employment Agreement. According to Section 2 of the Co–Employment Agreement, ERM and All–American agree to "act as joint co-employers with respect to the employees" of All–American, and ERM, in turn, "agrees to assume certain of [All–American's] Common Law Employer responsibilities and liabilities." Specifically, ERM is "... responsible for payment of employee payroll, employer federal, state and local taxes, specified employee benefits, and all required federal, state and local employee payments or withholdings from wages." All benefits and taxes are provided or paid under ERM's federal and state tax identification numbers, and ERM issues the W–2 form prescribed by the Internal Revenue Service and is designated as the employer on those forms.

Pursuant to paragraph 3, entitled "Administration," ERM "may exercise the right to control and direct certain management functions including, but not limited to, recruiting, hiring, training, evaluation, supervision, discipline, replacement, termination of employees and conducting of cost reduction measures and safety programs." The record does not disclose the extent to which, if any, ERM actually exercises these contractual rights, but it appears from other contractual provisions that All–American is responsible for securing and making employer assignments, regularly reviewing and evaluating employee performance, maintaining time records, recommending wage adjustments, providing work-related automobile insurance coverage

and directly communicating with the "co-employees" who are leased to others in furtherance of All–American's business.

Under paragraph 5a of the Co–Employment Agreement, ERM is required to provide, at its option, "workers' compensation insurance covering all employees which [ERM] co-employs with [All–American] or occupational injury and illness benefits under [ERM's] Employee Welfare Benefits Plan." Those "... benefits shall be equal to or exceed those required under the laws of the jurisdiction wherein employee is injured." As between the parties, All–American is responsible for providing a safe work environment which complies with applicable federal and state laws and with safety or health directives issued by ERM or by an insurer providing workers' compensation insurance for ERM.

All–American is compensated by those companies to which it leases the services of temporary employees. The record does not reflect the financial terms of those leases. All–American compensates ERM for providing the "co-employment services" by paying a "co-employment fee" of 3.5% "of Gross Payroll as respects employees co-employed with [All–American]" and a "set-up Fee @ $25.00 per employee."

## B. The Benefit Plan

To satisfy its obligations to provide "co-employment services" under the Co–Employment Agreement, ERM established and maintains Employee Welfare Benefit Plan Number 502 (the "Plan"), by which it provides to those employees for which ERM is a "co-employer," certain hospital, medical and dental benefits, death benefits, accidental death and dismemberment benefits and occupational injury and illness benefits. The parties have stipulated that the occupational injury and illness benefits provided to employees in Virginia are equal in amount and duration to those required by Virginia law.

As explained previously, the benefit which All–American, and ERM's other client "co-employers," derive from their relationship with ERM is said to be a substantial economic savings. More specifically, ERM and All–American represent in their brief that, "[b]y integrating state-mandated workers' compensation benefits in a multibenefit employee welfare plan, ERM has experienced an approximately 25% reduction in the cost of providing such benefits.... This savings has in part enabled ERM to expand the level of mandatory medical and hospital benefits which the Plan offers." (Plaintiff's Opening Brief, p. 10).

Pursuant to the terms of §§ 14.04(A) and 18.14 of the Plan, an employee who sustains a job related injury or illness is entitled to file a claim for injury or illness benefits with ERM's Plan Administrator "within five days after such injury." If the employee's claim is denied in whole or in part, the denial is appealable to ERM. If that appeal does not resolve the issue, the Plan permits the employee to resort to arbitration.[1]

An employee may be represented by legal counsel at any stage of the procedure. If the employee prevails in the arbitration and ERM does not appeal, the employee will receive benefits in the amount determined by the arbitrators, but the Plan does not permit the employee to recover the legal expenses incurred in prosecuting the claim.

If the results of the arbitration are not satisfactory, the employee may institute in a United States District Court a civil action to recover benefits pursuant to section 502 of ERISA, 29 U.S.C. § 1132. The court is permitted by ERISA to award the claimant reasonable attorney fees.

The Plan is self-funded by: (1) fees which ERM is paid by its "client co-employers," and (2) in some cases by employee contributions made through payroll deductions.[2] The assets of the Plan are held in trust as re-

---

1. The arbitration is to be held at any mutually agreeable location or, in the absence of agreement, at the ERM office closest to the employee's residence. The employee and ERM each select an arbitrator who, under the Plan, must be employed, or have past experience, in the insurance or employee benefits field. The two party-appointed arbitrators then select a third arbitrator.

2. Employee contributions fund medical benefits, for example, but are not used to fund workers' compensation benefits.

quired by 29 U.S.C. § 1103(a) and are reinsured by rated insurance companies for up to $20 million per occurrence above a self-insured retention of $300,000. This, however, fails to satisfy the requirements of Virginia's security law, Va.Code Ann. § 65.2–801 (1950) (hereinafter "Va.Code ____") and its accompanying regulations. For example, it does not comply with Va.Regs.Reg. 405–20–01 (hereinafter "VR ____") which requires that, to be self-insured, a corporation must:

(1) complete an "Employer's Application for Individual Self Insurance" (VWC Form No. 20);

(2) meet several substantive minimum requirements, including: displaying positive tangible worth, having had "no more than one net loss within the last three years," and maintaining a debt/equity ratio of less than 2.0. VR 405–20–01 § 3A;

(3) establish its financial solvency, efficiency, profitability, stability and future prospects. VR 405–20–01 § 4D; and

(4) following approval, submit to the Commission a corporate surety bond, issued by a licensed Virginia bond writer, the minimum amount of which must be the larger of $750,000 or two times the annual incurred costs (including reserves) for workers' compensation claims. VR 408–20–01 §§ 6A and 6F.[3]

As explained below, these deficiencies are the root cause of this litigation.

## C. The Circumstances Which Prompted This Litigation

When ERM and All–American executed the Co–Employment Agreement in September 1992, James W. McNutt, Jr. ("McNutt") was a co-employee of both ERM and All–American within the meaning of the Co–Employment Agreement.[4] All–American hired McNutt in mid-September 1992 and on October 4, 1992, All–American assigned him to work at New York Carpet World in Chesapeake, Virginia. At that time, All–American gave McNutt a general overview of his job assignment, but instructed him that specific tasks would be assigned by New York Carpet World.

On October 5, 1992, McNutt and a full-time employee of New York Carpet World were moving a roll of carpet when McNutt allegedly was injured. McNutt submitted a claim for workers' compensation benefits to ERM which paid some benefits, but denied others, thereby prompting McNutt to consult counsel who subsequently filed a claim for benefits with the Virginia Workers' Compensation Commission (the "Commission").[5]

After McNutt's claim was filed, the Commission determined that neither ERM nor All–American had complied with Va.Code §§ 65.2–800 and 65.2–801 which obligate Virginia employers to provide either workers' compensation insurance or security for self-insurance. Thereafter, the Commission's Uninsured Employers Fund entered the dispute by serving twenty-one special interrogatories on ERM and All–American who responded by asserting that they were exempt from the obligation to provide insurance or to provide security for their self-insurance fund because Virginia law was preempted by ERISA. For that reason, ERM and All–American declined to answer the interrogatories.

---

**3.** The Commission, in its discretion, shall increase the bond to reflect: (1) questionable incurred cost figures or unusual reserves practices . . .; (2) any change in the size or nature of operations . . .; (3) any aspect of the employment which suggests increased, unpredicated, incalculable or catastrophic workers' compensation exposure in the future. VR 405–20–01 § 6G.

**4.** The defendants assert that, as a matter of law, ERM cannot be an employer within the meaning of ERISA. For purposes of this decision, it will be assumed that ERM is an employer within the meaning of the statute because All–American would qualify as an employer and hence a decision that ERM is not an employer would not

avoid the need to address the pre-emption issues raised by ERM and All–American. Resolution of this action on the pre-emption issues makes it unnecessary for the court to decide whether ERM is an employer.

**5.** ERM continues to pay the undisputed part of McNutt's disability compensation at the rate provided for under the Virginia Workers' Compensation Act. In July, 1993, All–American and ERM terminated the Co–Employment Agreement, but, under the Plan, ERM remains obligated to pay benefits for any work related injury occurring during the time that the Co–Employment Agreement was in effect. Accordingly, the Plan continues to pay McNutt's benefits.

On September 2, 1993, the Commission set a hearing for October 28, 1993 for the purpose of adjudicating McNutt's claim. On September 14, 1993, the Commission issued an order directing ERM and All–American to respond to the special interrogatories previously issued by the Commission's Uninsured Employer Fund. On October 6, 1993, the Commission issued an order requiring ERM and All–American to appear on October 28, 1993 to show cause why civil penalties should not be imposed on them for failing to respond to the interrogatories and to litigate whether ERM and All–American had violated Va.Code §§ 65.2–800 or 65.2–801. Thereafter, ERM and All–American instituted this declaratory judgment action. The Commission ordered that the proceedings before it be held in abeyance, pending the outcome of this action.

## DISCUSSION

The cross-motions for summary judgment turn on the resolution of issues created by the intersection of various provisions of Virginia's Workers' Compensation Law with provisions of ERISA. Hence, it is useful briefly to recount the essential elements of the two statutory schemes.

### D. The Virginia Workers' Compensation Law

Workers' compensation is a system designed to provide cash benefits, medical care and vocational rehabilitation to employees who sustain injury or suffer illness arising out of, and in the course of, their employment. Lawrence J. Pascal, Virginia's Worker's Compensation Law and Practice (2 ed. 1993). Injured employees, of course, are entitled to compensation without regard to fault. A typical workers' compensation statute is imbued with the following features:

(1) the basic operating principle is that an employee is automatically entitled to certain benefits upon sustaining a personal injury by accident arising out of, or in the course of, employment;

(2) negligence and fault are largely immaterial;

(3) coverage is limited to persons having the status of employee;

(4) benefits include: cash wages, hospital, medical and rehabilitation expenses, or in death cases, benefits for dependents;

(5) the employee and dependents relinquish their common-law right to sue the employer for damages resulting from the injury;

(6) the employee and dependents retain the right to sue third persons for negligence;

(7) administration of the compensation system is typically in the hands of administrative commissions; and

(8) the employer is required to secure his liability through private insurance, state-fund insurance, or self-insurance, thus passing the burden of compensation liability onto the consumer, as a cost of production.

Larson, *Workmen's Compensation Law,* § 1.10 (1993).

Those features are present in Virginia's Workers' Compensation Act, which is found at Va.Code § 65.2–100 *et. seq.* As explained above, the security mechanisms of the Virginia statute require that employers secure their workers' compensation obligations by purchasing a policy of workers' compensation insurance from a carrier, licensed by the Virginia State Corporation Commission ("VSCC") or by receiving approval to self-insure from the Commission. Va.Code § 65.2–801. Self-insured employers are permitted to secure their obligations either by:

2. Receiving a certificate pursuant to Va. Code Ann. § 65.2–808 from the Commission authorizing the employer to be an individual self-insurer; or

3. Being a member in good standing of a group self-insurance association licensed by the VSCC.

Va.Code § 65.2–801(A)(2) and (3). Self-insured employers of both types are regulated extensively by the Commission and the VSCC to assure that the funding for occupational injury and illness benefits will be available when they are awarded. Regulation is accomplished by a detailed statutory scheme which is augmented by detailed regulations designed to measure the solvency of self-insuring employers and to require and verify

funding to back-up the obligations to provide workers' compensation benefits at the levels and for the durations required by law.

### E. The Purpose And Requirements of ERISA

In general, ERISA, the purportedly preempting statute, subjects to federal regulation the benefit plans offered by employers to their employees. "ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Shaw v. Delta Airlines, Incorporated,* 463 U.S. 85, 88, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983).

The stated purpose of Congress in adopting ERISA was to provide "minimum standards" for the operation of "employee benefit plans," thus "assuring the equitable character of such plans and their financial soundness." 29 U.S.C. § 1001(a). ERISA encompasses "any plan, fund or program ... established or maintained by an employer or by an employee organization, or by both, for the purpose of providing ... medical, surgical or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment." 29 U.S.C. § 1002(1).[6]

Although ERISA does not require an employer to provide any particular benefits, it imposes participation, funding and vesting requirements on employers who decide to provide covered pension and welfare benefits. 29 U.S.C. §§ 1051–1086. ERISA also sets various uniform standards, including rules concerning reporting, disclosure and fiduciary responsibility. 29 U.S.C. §§ 1021–1031, 1104–1114; and *Shaw,* 463 U.S. 85, 88, 103 S.Ct. 2890, 2895–96, 77 L.Ed.2d 490 (1983) (citations omitted).

Congress also included in ERISA a broad preemptive provision to avoid "the patchwork scheme of regulation" of benefit plans among the different states, *Fort Halifax Packing Company v. Coyne,* 482 U.S. 1, 9, 107 S.Ct. 2211, 2216, 96 L.Ed.2d 1 and to provide uniform, national regulation of benefit plans. Specifically, § 514(a) of ERISA, 29 U.S.C. § 1144(a), provides that:

> the provisions of this subchapter ... shall *supersede any and all state laws* insofar as they may now or hereafter *relate to* any employee benefit plan described in section 4(a) and not exempt under section 4(b)

(emphasis added). A state law "relates to" an ERISA plan "if it has a connection with or reference to such a plan." *District of Columbia v. Greater Washington Bd. of Trade,* — U.S. ——, ——, 113 S.Ct. 580, 583, 121 L.Ed.2d 513 (1992).[7]

State laws, or actions pursuant to state laws, that have been preempted because they "relate to" an ERISA-covered plan include: common law tort and contract actions asserting improper processing of a claim for benefits under an ERISA-covered benefit program, *Pilot Life Insurance Company v. Dedeaux,* 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987); a law specifically preempting ERISA-covered benefits from a generally applicable state garnishment law, *Mackey v. Lanier Collection Agencies and Service, Inc.,* 486 U.S. 825, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988); a law forbidding discrimination in employee benefit programs on the basis of pregnancy, *Shaw v. Delta Airlines, supra;* a law prohibiting offsets of worker compensation payments against pension benefits, *Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981); and a law purporting to prohibit an employer from deducting the amount of pension benefits previously paid to a retiree from subsequent retroactive workers' compensation award, *PPG Industries*

---

**6.** The plans to which ERISA regulations apply are outlined in 29 U.S.C. § 1003, which provides in pertinent part:

(a) except as provided in subsection (B) of this section ..., *this subchapter shall apply to any employee benefit plan* if it is established or maintained—

(1) by an employer engaged in commerce or an industry or activity affecting commerce; or

(2) by any employee organization or organizations representing employees engaged in commerce or in any industry or activity affecting commerce; or

(3) by both.

29 U.S.C. § 1003 (emphasis added).

**7.** State laws regulating insurance, banking or securities are exempt from preemption, as are generally applicable state criminal laws. 29 U.S.C. § 1144.

*Pension Plan A, et al. v. Crews,* 902 F.2d 1148 (1990). State laws that have been found not to "relate to" an ERISA-covered plan and hence not preempted include: a generally applicable garnishment law under which creditors can garnish ERISA welfare benefits, *Mackey, supra;* a state law requiring companies to make lump sum severance payments when closing a plant, *Fort Halifax Packing Company v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). *See, Aetna Life Insurance Company v. Borges,* 869 F.2d 142 (1989).

### F. The Preemption Issues Presented In This Action

Analysis of the preemption issue presented in this action starts with the premise that the reach of ERISA is broad. For example, the statute defines an employee welfare benefit plan to mean:

> ... *any plan,* fund or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, *to the extent that such plan,* fund, or program was established or *is maintained for the purpose of providing* for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs....

29 U.S.C. § 1002(1) (emphasis added). The Plan here falls within this broad definition because it was established and is maintained for the purpose of providing its participants with medical, surgical and hospital care benefits as well as dental benefits, accidental death and dismemberment benefits, death benefits and occupational injury and illness benefits. Thus, if the challenged Virginia laws "relate to" the Plan, they are preempted under § 514(a) of ERISA which preempts "any and all State laws insofar as they may now or hereafter relate to any employee

benefit plan covered by ERISA,"[8] unless they fall within the scope of § 4(b)(3) of ERISA which exempts from preemption employee benefit plans that are "maintained solely for the purpose of complying with applicable workmen's compensation laws or unemployment compensation or disability insurance laws." 29 U.S.C. § 1003(b)(3).

ERM and All-American contend that the challenged provisions of Virginia workers' compensation law, in practical effect, require employers to set up a separately administered and funded plan for occupational injury and illness benefits. This, they say, necessarily affects the type of benefits which an ERISA plan will offer which, in turn, means that those state laws "relate to" an employee benefit plan covered by ERISA and thus are preempted.

The defendants take the view that the challenged statutes do not "relate to" any ERISA-covered employee benefit plan and hence are not preempted. The defendants also assert that the challenged laws simply constitute a requirement by Virginia that employers provide workers' compensation benefits in plans "maintained solely for the purpose of complying with workers' compensation laws" and, therefore, are exempt from ERISA's preemptive provisions.

### 1. The "Related To" Issue And The Application Of Preemption Principles To the Plan

■ Preemption may occur as a consequence of an explicit Congressional command in the language of the statute or it may be implicit upon an examination of the structure and purpose of the federal statute. *Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 2898–99, 77 L.Ed.2d 490 (1983). Therefore, the principal task in determining whether a federal statute preempts a state statute is to ascertain the intent of Congress in enacting the specific federal statute.

■ ERISA's preemptive provision is both explicit and broad. By its terms, § 514(a) provides that ERISA "shall supersede *any*

---

**8.** 29 U.S.C. § 1144(a) (§ 514(a)) provides: except as provided in subsection (b) of this section, the provisions of this subchapter shall supersede any and all State laws insofar as

they may now or hereafter relate to any employment benefit plan described in section 4(a) and not exempt under section 4(b).

*and all State laws* insofar as they may now or hereafter *relate to* any employee benefit plan" covered by ERISA. (emphasis added). The Supreme Court of the United States has determined that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Airlines, Inc.,* 463 U.S. at 96–97, 103 S.Ct. at 2899–900. This broad language is not without limits for as the Court observed in *Shaw:* "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw v. Delta Airlines, Inc.,* 463 U.S. at 100, fn. 21, 103 S.Ct. at 2901. The Court, however, declined to decide "where it would be appropriate to draw the line." *Id.*

ERM and All–American assert that compliance with Virginia's security provisions necessarily increases the costs of providing the full range of benefits offered in the multibenefit program provided by the Plan. This is, they admit, an indirect effect on the Plan. They argue, nonetheless, that the indirect effect is sufficient to make the state statutes "relate to" an ERISA-covered plan because the economic reality of compliance is to force Virginia employers to provide the occupational injury and illness benefits required by Virginia's Workers' Compensation Act in a separately administered plan, subject to state regulation.

This argument recently was rejected by the United States Court of Appeals for the First Circuit in *Combined Management, Inc. v. Superintendent of the Bureau of Insurance,* 22 F.3d 1 (1st Cir. (Me.1994)). In *Combined Management,* the First Circuit construed the workers' compensation statute of Maine which, like its Virginia counterpart, required that employers provide workers' compensation insurance either through a state-approved insurance carrier or through a self-insurance plan meeting the state's qualifications. In that regard, Maine, like Virginia, required self-insured employers to provide evidence of their financial solvency and to meet certain funding requirements. The employer argued that "a state law that

creates a significant economic impact on an ERISA plan, without more, sufficiently 'relates to' the plan and is therefore preempted." *Combined Management Inc. v. Superintendent of the Bureau of Insurance,* 22 F.3d at 6–7. From that point of departure, the employer urged the court to hold that the Maine law "related to" the plan because the state law affected the cost of providing ERISA benefits offered in a multibenefit program.

The First Circuit began its analysis by explaining that "[s]tate laws that do not 'relate to' an ERISA-covered plan but instead 'relate to' a benefit plan established solely to comply with state workers' compensation laws are not preempted by ERISA." *Combined Management, Inc. v. Superintendent of the Bureau of Insurance,* 22 F.3d at 3. It then reviewed and rejected the employer's "significant economic impact" argument, holding that, although the state law obviously had an economic impact on the employer, it did not have an economic impact on the plan itself. The court's reasoning is instructive:

Clearly, any law that increases a company's cost of doing business can be said to affect that business's ability to provide benefits under its welfare benefit plan. This is not the same, however, as imposing burdens on the welfare benefit plan itself. The increased cost or administrative burdens imposed by the state law must have some connection to the covered ERISA plan before the preemption analysis can come into play. (citations omitted).

\*     \*     \*     \*     \*     \*

In requiring CMI to provide separate coverage for workers' compensation, Maine does not increase the operational expenses or input costs of the ... Plan nor does it impose any additional administrative burdens, benefit requirements, or other obligations on the ... Plan. Maine's law may increase CMI's cost of doing business, but it does not affect the ... Plan's cost of providing benefits or costs of administration.

22 F.3d at 7.[9] For those reasons, the First Circuit concluded that Maine's law did not

---

9. The court also concluded that, if the employer

voluntarily elected to change its coverage under

"relate to" an ERISA-covered plan and therefore was not preempted.

The United States Court of Appeals for the Ninth Circuit reached a similar conclusion for somewhat different reasons in *Employee Staffing Services, Inc. v. Aubry*, 20 F.3d 1038 (9th Cir. (Cal.1994)). There, Employee Staffing Services, Inc. sponsored an ERISA plan which covered work related injuries and provided medical, health and life insurance benefits. Stafcor, a subsidiary of Employee Staffing Services, Inc., was paid by firms in the California garment industry to provide workers for those companies and, to that end, Stafcor employed workers who were covered by the plan maintained by Employee Staffing Services, Inc.

Acting pursuant to provisions of its workers' compensation law which are virtually identical to those in Virginia, the State of California ordered Stafcor to stop using any employee labor until it had secured workers' compensation insurance. There, as here, the employers argued "... that if they have to buy workers' compensation insurance, they will have no reason to provide so rich an ERISA plan as they do now." 20 F.3d at 1042. The Ninth Circuit observed that "[t]he suggestion is that this impact of the state workers' compensation law on their [the employers'] economic incentives amounts to an indirect effect relating to the ERISA plan." *Id.* The court rejected this argument for the reason that "[t]he economic effect of independent State requirements on employers' incentives in drafting ERISA plans should be distinguished from the legal effect of State commands regarding ERISA plans." *Id.*

The rationale which produced the decisions in *Combined Management* and *Employee Staffing* applies with equal force to the facts presented here. Like their counterparts in Maine and California, the challenged Virginia statutes may well increase an employer's cost of doing business, but that is not the same as imposing burdens on the benefit plan itself.

Here, ERM argues that it can provide more benefits of other types at a lesser cost, if it is not required to satisfy the provisions of the Virginia law requiring security for the

workers' compensation benefits. There is no reason to doubt the accuracy of that contention. However, that admittedly indirect economic effect on the employer's cost of doing business is not a burden imposed on the plan itself.

The decisions in *Combined Management* and *Employee Staffing* are consistent with the decisions of other courts of appeals interpreting the reach of ERISA's broad, but not unlimited, preemptive clause. For example, in *Aetna Life Insurance Company v. Borges*, 869 F.2d 142 (2d Cir.1989), the United States Court of Appeals for the Second Circuit explained that:

> [state] laws that have been ruled preempted are those that provide an alternative cause of action to employees to collect benefits protected by ERISA, refer specifically to ERISA plans and apply solely to them, or interfere with the calculation of benefits owed to an employee. *Those that have not been preempted are laws of general application—often traditional exercises of state power or regulatory authority—whose effect on ERISA plans is incidental.*

*Id.* at 146 (emphasis added). The Second Circuit also observed that indirect economic impact alone did not conflict with ERISA's aim of national uniformity and plan regulation because there is "no valid reason why employee benefit plans cannot be subject to nationally uniform supervision despite dissimilarities in their cost of doing business." *Rebaldo v. Cuomo*, 749 F.2d 133, 139 (2d Cir.1984). For these reasons, the court concluded that the mere fact that a state statute has some economic impact on an ERISA-covered plan does not require that the statute be invalidated because:

> What triggers ERISA preemption is not just any indirect effect on administrative procedures but rather an effect on the primary administrative functions of benefit plans, such as determining an employee's eligibility for a benefit and the amount of that benefit.

*Borges*, 869 F.2d at 146, 147.

A more elaborate articulation of this rationale respecting ERISA preemption appears

---

the plan in response to the requirements of the state law, that such a decision would constitute

at most an effect of the law that "is too 'tenuous' and 'remote' to warrant preemption." *Id.*

in *Martori Brothers Distributors v. James–Massengale,* 781 F.2d 1349 (9th Cir.1986), wherein the United States Court of Appeals for the Ninth Circuit, based on an interpretation of *Shaw* and its progeny, concluded that state laws that have been preempted by § 514(a) because they "relate to" ERISA plans fall into four categories:

> First, laws that regulate the *type of benefits* or terms *of ERISA plans.* Second, laws that *create* reporting, disclosure, funding or vesting *requirements for ERISA plans.* Third, laws that *provide rules* for the calculation of the amount of benefits to be paid *under ERISA plans.* Fourth, laws and common-law rules that *provide remedies* for misconduct growing out of the administration *of the ERISA plan.* The principle underlying all of these decisions would appear to be that the state law is preempted by section 514(a) if the conduct sought to be regulated by the state law is 'part of the administration of an employee benefit plan'; that is, *the state law is preempted if it regulates the matters regulated by ERISA:* disclosure, funding, reporting, vesting and enforcement of benefit plans.

*Id.* at 1357–1358 (emphasis added).

The United States Court of Appeals for the Fourth Circuit has held that indirect state action may be preempted in certain circumstances because:

> ERISA preemption, moreover, 'is not limited to state laws specifically designed to affect employee benefit plans,' *Pilot Life Insurance Company v. Dedeaux,* [481 U.S. 41, 47–49,] 107 S.Ct. 1549, 1553[, 95 L.Ed.2d 39] (1987) (quoting *Shaw,* [463 U.S. at 96–98,] 103 S.Ct. at 2900), for 'even indirect state action bearing on private pensions may encroach upon the area of exclusive federal concern.' *Alessi v. Raybestos–Manhattan, Incorporated,* [451 U.S. 504, 524–26,] 101 S.Ct. 1895, 1907[, 68 L.Ed.2d 402] (1981).

10. The Court of Appeals in *PPG* held:

> [i]t makes no difference that the statutory provision relating to this Plan is captioned 'workers compensation.' It is of no moment that the

*PPG Industries Pension Plan A, et al. v. Crews,* 902 F.2d 1148, 1150 (1990). That language, on which ERM relies so heavily, must be read in the context in which it was used. In *PPG,* the Fourth Circuit reviewed a section of West Virginia's Workers' Compensation Act that was found to integrate pension benefits with awards of workers compensation by requiring that the pension payment be reduced by the amount of any applicable workers' compensation award. *Id.* Thus, while the effect of the West Virginia law was indirect, its application had a direct effect upon the pension plan which, of course, is an "area of federal concern" under ERISA.[10] For the reasons set forth above, the state laws here at issue do not have an effect on the Plan. Accordingly, *PPG* neither dictates a different result here nor is in any way inconsistent with the reasoning in *Combined Management, Employee Staffing, Borges* or *Martori.*

For the foregoing reasons, the court finds that the challenged provisions of Virginia's workers' compensation law do not "relate to" an ERISA-covered plan and therefore are not preempted by § 514(a) of ERISA.

**2. The Applicability of the Exemption**

Even if the Virginia workers' compensation statutes requiring security for workers' compensation benefits in the form of insurance or an approved self-insurance program were found to "relate to" an ERISA plan and thereby to fall within the preemptive reach of § 514(a), the Virginia statutes would nonetheless be exempt from preemption under 29 U.S.C. § 1003(b), § 4(b)(3) of ERISA, which provides that

> [t]he provisions of this subchapter shall not apply to any employee benefit plan if—
>
> \* \* \* \* \* \*
>
> (3) such plan is maintained solely for the purpose of complying with applicable workman's compensation laws or unemployment compensation or disability insurance laws.

> state intrudes indirectly, through a workers compensation law, rather than directly, through a statute called 'pension regulation.' *PPG Industries,* 902 F.2d 1148, 1151 (4th Cir. 1990) (citations omitted).

ERM and All–American contend that the fact that the Plan offers occupational injury and illness benefits as part of a multibenefit plan forecloses the exemption because, by definition, a multibenefit plan is not maintained "solely for the purpose of complying with applicable workmen's compensation laws."

A similar contention was rejected by the Supreme Court of the United States in *Shaw v. Delta Airlines, Inc.,* 463 U.S. at 108, 103 S.Ct. at 2905–06 wherein the Court construed § 4(b)(3) as it related to New York's disability insurance laws. The exemption for workers' compensation laws is established by the same clause of § 4(b)(3) which the Court applied in holding in *Shaw* that New York's disability insurance laws were exempt from preemption.

Concluding that the plain language of § 4(b)(3) afforded exemption to "[o]nly separately administered disability plans maintained solely to comply with the Disability Benefits Law, *id.,* the Court also held that:

> This is not to say, however, that the [employers] are completely free to circumvent the Disability Benefits Law by adopting plans that combine disability benefits inferior to those required by that law with other types of benefits. Congress surely did not intend, at the same time it preserved the role of State disability laws, to make enforcement of those laws impossible. *A State may require an employer to maintain a disability plan complying with state law as a separate administrative unit. Such a plan would be exempt under § 4(b)(3).* The fact that state law permits employers to meet their state-law obligations by including disability insurance benefits in a multibenefit ERISA plan, ... does not make the State law wholly unenforceable as to employers who choose that option.

In other words, *while the State may not require an employer to alter its ERISA plan, it may force the employer to choose between providing disability benefits in a separately administered plan and including the state-mandated benefits in its ERISA plan. If the State is not satisfied that the ERISA plan comports with the requirements of its disability insurance law, it may compel the employer to maintain a separate plan that does comply.* *Shaw v. Delta Airlines, Inc.,* 463 U.S. at 108, 103 S.Ct. at 2905–06 (emphasis added). That same rationale controls the result here because the same statute which the Court interpreted in *Shaw* affords exemption to both disability insurance laws and workers' compensation laws.

The United States Court of Appeals for the First and Ninth Circuits, respectively, have reached this conclusion in decisions interpreting the effect on similar benefit plans of workers' compensation laws virtually identical to those challenged here. In *Employee Staffing,* the Ninth Circuit was confronted directly with the argument that "... the reference to the coverage exemption of section 1103(b) [section 403(b)] has no application to their [the employer's] multi-purpose plan because it is not maintained 'solely' for the purposes of workers' compensation." *Employee Staffing Services, Inc. v. Aubry,* 20 F.3d at 1040. The court rejected this argument for the reason that:

> But the fact that the State cannot regulate plaintiffs' ERISA plan does not imply that the State cannot require another, separately administered plan for workers' compensation. *Shaw* says that although a State cannot regulate an employer's ERISA plan, it can require an employer to maintain a separate disability plan exempt from ERISA, under the same coverage exemption as applies to workers' compensation plans....

20 F.3d at 1040–41. The Ninth Circuit noted that the syntax of the statute "might be construed to place the power to exempt in the employer's hands, when it adopts a plan, instead of the state legislature's hands, when it promulgates laws." *Id.* However, the court rejected that interpretation of ERISA because:

> ... a construction which attributes a rational purpose to Congress makes this locus of power unlikely, because it would accidentally allow employers to avoid the century-old system of workers' compensation. *Shaw* removes any ambiguity which might be found in the ERISA statute on

this issue. We see no reason to distinguish worker's compensation plans from disability plans, since both are controlled by identical language in the same subsection of the ERISA statute, and the same reasons apply to both.

*Id.* Accordingly, the Ninth Circuit concluded that *Shaw* was controlling and that California's workers' compensation laws requiring employers to secure payment of worker's compensation benefits either by purchasing worker's compensation insurance from a state approved carrier or by self-insuring under an approved plan were exempt from ERISA's preemptive provision.

Shortly thereafter in *Combined Management,* the First Circuit was confronted with virtually the same statutory provisions and the same plan, and held that "[b]ecause disability benefit laws are exempted from ERISA's coverage by the same provision exempting worker's compensation laws ... the *Shaw* decision applies directly to this case." 22 F.3d at 4. Having reached that conclusion, the First Circuit held that:

> Maine's workers' compensation law falls squarely within the dictates of *Shaw.* [The Maine statute] mandates that employers provide workers' compensation by purchasing approved insurance or by establishing an approved self-insurance plan. This is precisely what the Supreme Court contemplated when it found that states "may require an employer to maintain a [§ 4(b)(3) exempt] plan as a separate administrative unit." (citations omitted).

22 F.3d at 5.

The employer in *Combined Management,* like ERM and All–American here, argued that *Shaw* meant merely that states can only require employers to provide a specified level or package of workers' compensation benefits and cannot otherwise interfere with plan administration through provisions such as the funding and solvency requirements of the Maine statutes. As the First Circuit observed, the thrust of this argument is that the exemption provided by § 4(b)(3) of ERISA applies only to laws that mandate benefit outputs instead of laws establishing separate benefit plans. The court explicitly rejected the argument, which is the same as the one made here by ERM, holding that:

> Likewise, *Shaw* does not limit the exemption under § 4(b)(3) to State laws mandating a specific level or package of benefits as opposed to laws mandating solvency and funding requirements. There is no basis for this distinction in § 4(b)(3) or in *Shaw.* Additionally, the language of those two authorities indicates that the case for exemption of solvency requirements is even stronger than the case for exemption of benefit requirements. (citations omitted). If anything, state laws mandating specific benefits from an ERISA-covered plan are more likely to 'relate to' that ERISA plan than laws which merely require the creation of an ERISA-exempt plan and which make no demands on the ERISA-covered plan itself. Thus, the instant case presents an even clearer application of § 4(b)(3)'s exemption than does *Shaw.*

*Combined Management, Inc. v. Superintendent of the Bureau of Insurance,* 22 F.3d at 6. The reasoning which prompted the First Circuit to find that the Maine statutes were exempt from preemption produces the same result in this action.

For the foregoing reasons, the court concludes that, even if the challenged provisions of Virginia's Workers' Compensation statutes are interpreted to "relate to" an ERISA-covered plan, they are exempt from preemption under § 4(b)(3) of ERISA.

## CONCLUSION

For the reasons set forth above, the plaintiffs' motion for summary judgment is denied, the defendants' motion for summary judgment is granted and the action is dismissed with prejudice.

The Clerk is directed to send a copy of this Memorandum Opinion and Order to all counsel of record.

It is so ORDERED.