**Carl T. WILLIAMSON, Plaintiff,**

v.

**GTE PRODUCTS CORP.,
et al., Defendants.**

No. 3:CV–94–2052.

United States District Court,
M.D. Pennsylvania.

March 4, 1997.

---

dealer, has purposely delayed the resolution of plaintiff's claims.

George A. Reihner, Kevin Christopher Quinn, Elliott Reihner Siedzikowski North & Egan, Scranton, PA, for plaintiff.

John J. Myers, Daniel L. Bell, Eckert Seamans Cherin & Mellott, Pittsburgh, PA, for defendants.

### *MEMORANDUM*

McCLURE, District Judge.

### *BACKGROUND:*

On December 19, 1994, plaintiff Carl T. Williamson initiated this action with the filing of a complaint pursuant to the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq. (ERISA). Williamson alleges that he was induced through misrepresentations to retire early from his employment with defendant GTE Products Corp., which prevented his participation in a voluntary severance program offered by defendant Osram Sylvania, Inc., after it acquired Williamson's former employer. An amended complaint, the effect of which was to substitute all of the named defendants save Osram, was filed on April 8, 1996.

Before the court is defendants' motion for summary judgment.

### *DISCUSSION:*

### *I. STANDARD OF REVIEW*

Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that *there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*" Fed.R.Civ.P. 56(c) (emphasis added).

> ... [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323–324, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The moving party bears the initial responsibility of stating the basis for its motions and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. He or she can discharge that burden by "showing ... that there is an absence of evidence to support the nonmoving party's case." *Celotex* at 323, 325, 106 S.Ct. at 2552–53, 2554.

Issues of fact are genuine "only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986)). Material facts are those which will affect the outcome of the trial under governing law. *Anderson* at 248, 106 S.Ct. at 2510. In determining whether an issue of material fact exists, the court

must consider all evidence in the light most favorable to the non-moving party. *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir.1988).

## II. STATEMENT OF FACTS

1. Williamson was employed by GTE Products Corp. or a predecessor from June, 1970, until his retirement on December 30, 1992.

2. Williamson was the Purchasing Manager for the Chemical and Metallurgical Division of GTE's Precision Materials Group.

3. Williamson was employed at the Towanda, Pennsylvania, plant.

4. Williamson's date of birth is November 4, 1928, meaning that he retired at age 64.

5. Williamson was responsible for division purchases of bulk gases, molybdenum, natural gas, propane, zirconium, and tantalum, among other duties.

6. Williamson has a bachelor's degree in commerce and finance.

7. Williamson handled approximately $40 million in annual raw material and fuel purchases and had seven employees reporting to him.

8. GTE Service Corp. was a service corporation responsible for the administration of various employee benefit and compensation programs for the GTE Corp. affiliates, including GTE Products Corp.

9. Williamson was a participant in, and is a retiree under, a defined benefit employee pension plan named the GTE Products Corporation Plan for Employees' Pensions.

10. The designated Plan Administrator of the Pension Plan was the GTE Service Corporation Employee Benefits Committee.

11. GTE Electrical Products Group and GTE Precision Materials Group are unincorporated operating divisions, neither of which is a legal entity having capacity to sue or be sued.

12. On January 29, 1993, the stock of GTE Products Corp. was purchased by a U.S. subsidiary of a German corporation, Os-ram Gmbh (which in turn is a subsidiary of Siemans, A.G.), as part of an acquisition of GTE's North American lighting business.

13. The name of the acquired corporation was changed as of January 29, 1993, to Osram Sylvania, Inc., one of the defendants.

14. Although the acquisition and name change were formalized on January 29, 1993, these events were part of a longer process which led up to the acquisition.

15. On August 6, 1992, GTE, Siemans and Osram entered an agreement for the sale.

16. The agreement became known to GTE's employees, and a memorandum confirming the sale was circulated on September 14, 1992.

17. On September 28, 1992, Williamson notified GTE that he intended to retire effective December 30, 1992.

18. Williamson was told that he had the right to rescind his retirement election if he so chose.

19. Williamson's stated reasons for retiring were his age, uncertainty about how the sale would affect him, and an announced change in the cost of retiree medical benefits for employees who retired after December 30, 1992.

20. In an employee announcement dated October 30, 1992, the GTE employees, including Williamson, were informed that (i) the tentative closing date for the Osram sale was December 14, 1992; (ii) the sales agreement with Osram included provisions which would protect retiree pension and other post-retirement benefits earned before the sale for employees like Williamson, who had the requisite age and service, even if they retired after the sale; (iii) the sales agreement with Osram included provisions which would ensure that employees who were involuntarily terminated within a year after the sale would receive at least as much in severance benefits as they would have under the GTE severance plan; and (iv) any questions about retirement or the impact of the sale on retirement decisions should be directed to the Retirement Programs Office.[1]

1. Williamson denies this recitation as "self-serv-

ing and selective." Plaintiff's Response to De-

21. Although there were rumors circulating within the last year that Williamson worked for GTE that a retiring employee would receive severance benefits, Williamson was never promised by the company that one could both retire voluntarily and receive severance pay.

22. On November 23, 1992, the Retirement Programs Office announced that employees who notified the Company of their retirement would not be permitted to rescind that decision.[2]

23. The November 23, 1992, announcement by the Retirement Programs Office contradicted assurances made by Van Laderer, Director of Operating Services at the Towanda facility, and Peter Broderick, Director of Human Resources at the Towanda facility, that Williamson would have the unconditional right to rescind his retirement decision.

24. After his initial announcement of his intent to retire effective December 30, 1992, Williamson confirmed this decision in forms signed and completed by him on November 6, 1992, November 19, 1992, and November 24, 1992. In each instance, however, Williamson continued to believe that he had the right to rescind his decision to retire.

25. On November 25, 1992, Williamson talked to Gary Reiter, an employee in the Human Resources Department, and Broderick (Reiter's manager) about rescinding his decision to retire, and was informed that the decision could not be rescinded due to the change in policy described in ¶ 22, above.

26. Williamson confirmed the information concerning his inability to rescind his retirement decision in a memorandum to Reiter on December 8, 1992.

27. Williamson's December 8, 1992, memorandum also noted that he had forwarded paperwork necessary to implement his retirement decision based on the fact that he could not rescind the decision.

28. Williamson asked to rescind his retirement election because there had been no announcement of a voluntary or involuntary reduction in force which would have permitted him to get both severance pay and retirement benefits.[3]

29. On December 11, 1992, GTE announced that (i) the closing date for the Osram sale had been delayed; and (ii) employees who wanted to rescind their retirement notices could do so by acting on or before December 18, 1992, thereby giving Williamson the opportunity to rescind his decision to retire.

30. As of the end of November, 1992, Laderer had begun the process of finding a replacement for Williamson.

31. Although Laderer indicated in his deposition that Williamson was involved in the process, Williamson testified that his only participation was to advise Laderer that one particular individual would not be a good replacement because of that individual's workload at the time.

32. Laderer was unable to fill the position immediately because a hiring freeze went into effect.

fendants' Statement of Material Facts at 4 ¶ 8. Any party reciting facts will tend to offer "self-serving" facts, and the facts are selective due to the length of the memorandum; plaintiff can certainly add any necessary facts or data from the memorandum necessary for disposition of the motion for summary judgment. That the recitation is "self-serving and selective" is no basis for rejection of the facts recited. Nor is the argument any more persuasive relative to the other instances of facts proffered by defendants which Williamson argues are "self-serving" and/or "selective."

2. Defendants recite the reasons underlying this announcement. We do not find the rationale to be material for purposes of summary judgment.

3. Williamson objects to this recitation by defendants because it portrays him as greedy. Any such characterization is immaterial to the instant motion. Regardless, the court's understanding is that Williamson originally elected to retire because of his age and the uncertainty of the situation surrounding the sale, including the effect of the change in sale on the cost of benefits. Williamson therefore elected to retire with the understanding that he could rescind the decision in the event that a more beneficial situation, such as a voluntary termination with severance pay, arose. In this court's view, a characterization of such decision-making as evincing a greedy nature is unwarranted.

33. On December 17, 1992, Laderer approached Williamson for the purpose of relating information which Laderer believed would be material to Williamson's retirement decision.

34. According to Williamson, Laderer stated: (i) Osram definitely would not be offering a voluntary severance/early retirement program to employees following the sale; (ii) Osram would be eliminating at least 40 positions at the Towanda facility, including one position in Williamson's Purchasing Department; and (iii) while the position eliminated would not be Williamson's, the least senior employee would be eliminated, that person being a young man with a family.

35. According to Williamson, Broderick also indicated to Williamson that Osram definitely would not be offering a voluntary severance/early retirement incentive program after the sale was complete; instead, Broderick indicated that Osram would be implementing an involuntary severance program to reduce the workforce.

36. On December 18, 1992, Williamson signed a form which reconfirmed his decision to retire effective December 20, 1992.

37. Also on December 18, 1992, Williamson sent a memorandum to Reiter which stated in relevant part:

I can understand your surprise when I turned in the form today indicating that I would let in place the paperwork for retirement on December 30, 1992. It was a difficult decision, since no one can see into the future. But considering all of the options it appears to be the better choice, with the one factor of medical costs making December 30, 1992 a critical date for me.

With the potential for downsizing under Osram, and the possibility of a severance offer resulting, I would naturally have stayed on but for the fact that Pete Broderick has reiterated that there will be no severance package, and Van Laderer has told me that even if there should be a severance offer, that my position would not be affected. Van also said that he has been told that in no way could he work a switch such as occurred with Ed Ulatowski on the last severance program.

Amended Complaint, Exhibit 5.

38. On December 22, 1992, Reiter responded to Williamson's December 18, 1992 memorandum with his own memorandum, which stated in relevant part:

I have had many discussions with Pete on the possibility of a severance package or voluntary retirement package due to the upcoming divestiture with Osram. Again, it is very difficult to predict the future, however at this time he has no knowledge of any severance package or program with GTE or potential programs after the divestiture with Osram. In reference to your conversations with Van, he also is basing his comments on current knowledge.

N.T. 11/14/95 (Williamson deposition), Exhibit L.

39. When Williamson received Reiter's December 22, 1992, memorandum, he did not voice objection to it and found it to be consistent with his own memorandum of December 18, 1992, except that, when the representations were made to him by Laderer that Osram would not offer a voluntary severance program and by Broderick that Osram would be implementing an involuntary severance program, the representations were not qualified by any statement regarding current knowledge.

40. GTE did not offer any voluntary separation or retirement packages or programs to its employees prior to January 29, 1993.

41. As of Williamson's retirement date, no one within the GTE organization had information that Osram would offer a voluntary separation program after the sale.[4]

---

4. Williamson disputes this fact by pointing to a document produced in discovery which refers to a voluntary severance program as early as July, 1992. The document is an Osram document and does not reflect disclosure to GTE, and the Osram representative testified that he was unaware of any GTE personnel who would have been aware of any Osram plans with respect to a voluntary severance program. Moreover, the document reflects only that a voluntary severance program was an option for the integration process, and does not indicate that such a course had been or would be adopted.

42. Williamson does not believe that Laderer, Broderick, Reiter or anyone else intentionally lied to or misled him with respect to information provided in November or December of 1992, although Williamson contends that these individuals were grossly negligent in the discharge of their fiduciary duties.

43. Osram Sylvania, Inc., did reduce the workforce, including the workforce at the Towanda facility, after the sale.

44. The reduction in force was done by offering a voluntary termination first, then by involuntary layoffs, a method which had been employed by GTE in the past.

45. Following his retirement, Williamson's job was filled and was not eliminated in the reduction in force.

46. There was a reduction in the Purchasing Department when Richard Dunn accepted the voluntary program and was not replaced.[5]

47. In late January or early February of 1993, a Human Resources Team was formed for the purpose of, *inter alia,* recommending a method of reducing the workforce.

48. The Human Resources Team presented its recommendation as to the method of reducing the workforce to the Osram Sylvania Board of Directors in a document dated February 17, 1993.

49. The method recommended within the February 17, 1993, document was approved by the Osram Sylvania Board of Directors.

50. The voluntary separation program was announced to the Towanda employees in writing on March 12, 1993.

51. All employees who opted to elect the voluntary termination program at the Towanda plant were accepted.

52. GTE agreed, in an Employee Transfer Agreement signed as part of the stock purchase agreements, that it would reimburse Osram for the incremental costs of providing an enhanced severance benefit to employees terminated within a year after the closing.

53. GTE and Osram had a dispute over whether GTE was required to reimburse Osram for severance costs attributable to employees who volunteered for reduction pursuant to the voluntary termination program offered on March 12, 1993, with GTE contending that voluntary separations were not contemplated.[6]

\*     \*     \*

For the sake of brevity and clarity, the facts may be summarized as follows:

In 1992, the corporation which employed Williamson, a subsidiary of GTE, was to be sold to Osram. During the pendency of the sale, plans were made for the transition, some of which were made known to personnel within GTE. An Osram internal document indicates that there was to be a reduction in force after the sale and that a Human Resources team would be formed to determine how to go about implementing the reduction. One of the options available was a voluntary severance program. There is no direct evidence, however, that plans for a voluntary severance program were made known; in fact, no Human Resources team had yet been formed, so no final decision on a voluntary severance program had been made.

Meanwhile, Williamson was gathering information with respect to making a decision on retirement before December 30, 1992, the date on which the cost of retiree medical benefits would increase. A number of other factors, including the effect of the sale and

---

**5.** Williamson denies this fact based on his own testimony that he heard from an unidentified person that the speaker replaced Dunn. This assertion is inadmissible hearsay, and shows no basis for Williamson's personal knowledge of whether another person was hired in the Purchasing Department after Dunn's retirement. That the speaker may have been performing Dunn's former duties does not mean that no reduction in force took place: Dunn's functions can have been assigned to other employees with- in the Purchasing Department who were employed already at the time Dunn retired.

**6.** Williamson denies this factual recitation but provides no basis for doing so. The averment is substantiated by the transcript of the deposition of Alvin Ludwig at 31–32, and so is accepted as fact for purposes of summary judgment. The remainder of the recitation proffered by defendants involves inferences to be drawn from this statement.

his age, also played a role. Because he had to provide advance notice but could rescind the decision, Williamson elected to retire but would continue working if a more favorable situation arose. The specific favorable situation considered by Williamson was the potential for a voluntary severance program. It was known to employees at GTE that there would be a reduction in force after the sale, and GTE in the past had used voluntary severance as a means to reduce its workforce.

Williamson later learned that, due to a policy change, he would not be able to rescind his retirement decision. However, it was announced on December 11, 1992, that employees who had given notice to retire could rescind the decision on or before December 18, 1992. By this time, Williamson's supervisor had begun the process of finding a replacement. According to Williamson (and therefore accepted as fact for purposes of the motion for summary judgment), he was told by his supervisor that there definitely would be no voluntary severance program, and that there would be a reduction in force which would affect the least senior person in Williamson's department if Williamson rescinded his retirement decision.

On December 18, 1992, Williamson reconfirmed his decision to retire and indicated in a memorandum that his decision was based on the unavailability of a voluntary severance program. A response four days later from the Human Resources Department indicated that the information provided to Williamson was based on then-current information, a qualification Williamson had not heard before.

The sale of the division which had employed Williamson was finalized on January 29, 1993. A that point, the Human Resources team was formed, formed a plan for the reduction in force, and presented it to the Osram board of directors on February 17, 1993. The plan, which was adopted by the board, included a voluntary severance program to be followed by an involuntary severance program if a further reduction in force was necessary. The plan was announced to employees on March 12, 1993. Had Williamson rescinded his retirement decision, he would have been eligible for the voluntary severance program.

## III. PLAINTIFF'S CLAIMS

The amended complaint sets forth three causes of action for which Williamson seeks recovery: interference with rights protected under ERISA, in violation of 29 U.S.C. § 1140 (Count I)[7]; deprivation of benefits due under an ERISA plan, pursuant to 29 U.S.C. § 1132(a)(1)(B) (Count II); and breach of fiduciary duty, in violation of 29 U.S.C. § 1104 (Count III). Each of these claims presumes that ERISA is applicable, based on the existence of an ERISA plan. Defendants' motion, in part, is based on a contention that the voluntary severance program does not constitute a plan under ERISA. Since our jurisdiction is premised on a federal question, which in turn is premised on the existence of an ERISA plan, we turn initially to the question of whether the voluntary severance program constitutes an ERISA plan.

## IV. ERISA PLAN

The Supreme Court of the United States, in a slightly different context, has provided a definition of "plan" for purposes of ERISA. In *Fort Halifax Packing Co., Inc. v. Coyne*, 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987), the question was "whether a Maine statute requiring employers to provide a one-time severance payment to employees in the event of a plant closing ... is pre-empted by either [ERISA] or the National Labor Relations Act ..." *Id.* at 3–4, 107 S.Ct. at 2213–14 (citations, footnote omitted). The Maine Supreme Judicial Court held that the statute was not pre-empted because ERISA governs plans created by employers or employee organizations, not state legislatures. *Id.* at 6, 107 S.Ct. at 2214–15. The Supreme Court affirmed, but on the basis that the Maine

---

7. Cases discussing provisions of ERISA often provide both the section of the act and the section of the United States Code. *See, e.g., Ream v. Frey,* 107 F.3d 147, 151 (3d Cir.1997) (citing governing provision as both 29 U.S.C. § 1132(a)(2) and ERISA § 502(a)(2)). For the sake of simplicity, we will refer to the codified section numbers only.

statute did not create a "plan" under ERISA. *Id.* In doing so, the Court defined "plan" for such purposes.[8]

The Court first noted that ERISA governs "plans," not all employee benefits. *Id.* at 7–8, 107 S.Ct. at 2215–16.

The Court then turned to the intent of Congress with respect to the pre-emption provision of ERISA, 29 U.S.C. § 1144(a). Congress wished to provide uniform standards for administering employee benefit plans, so that employers would not be burdened by regulations which varied from state to state:

> It is thus clear that ERISA's pre-emption provision was prompted by recognition that employers establishing and maintaining employee benefit plans are faced with the task of coordinating complex administrative activities. A patch-work scheme of regulation would introduce considerable inefficiencies in benefit program operation, which might lead those employers with existing plans to reduce benefits, and those without such plans to refrain from adopting them. Pre-emption ensures that the administrative practices of a benefit plan will be governed by only a single set of regulations.

*Id.* at 11, 107 S.Ct. at 2217. These concerns, however, are implicated only when the administration of a plan is implicated, as opposed to simply benefits. *Id.*

Further, the primary reason for enacting ERISA was to prevent abuse of funds administered by a plan, as by self-dealing, imprudent investing, and misappropriation of plan funds. *Id.* at 15, 107 S.Ct. at 2219. It is the administration of a plan which is potentially subject to such abuse, while this concern is not implicated when there are no on-going transactions to record in an annual report or information to gather because the terms of the benefit are clear. *Id.* at 16, 107 S.Ct. at 2219.

The Court next concluded that its holding did not allow employers to circumvent ERISA because the rationale for its holding differed from that of the Maine Supreme Judicial Court. The Court found its rationale consistent with prior cases, summarily affirmed by the Supreme Court, in which courts of appeals had held that severance programs were governed by ERISA. In those cases, the severance programs required administration, and the issue actually was whether plans in which funds were paid from general assets as opposed to trust funds fell within ERISA. *Id.* at 17–19, 18 nn. 10, 11, 107 S.Ct. at 2220–21, 2221 nn. 10, 11.

The primary point to be derived from *Fort Halifax*, then, is that ERISA is implicated only when there is a "plan," and a one-time payment of severance benefits is not a "plan" because there is no on-going administrative scheme. It also should be noted that the Court recited examples of the functions involved in administering a plan, including "determining the eligibility of claimants, calculating benefit levels, making disbursements, monitoring the availability of funds for benefit payments, and keeping appropriate records in order to comply with applicable reporting requirements." *Id.* at 9, 107 S.Ct. at 2216.

The Supreme Court's holding in *Fort Halifax* was interpreted and applied by the Court of Appeals for the Third Circuit in *Angst v. Mack Trucks, Inc.*, 969 F.2d 1530, 1538–1541 (3d Cir.1992). In that case, the employer had offered a severance program involving an initial payment of $75,000.00 and one year of continued benefits (already provided prior to the buy-out). *Id.* at 1538. The Third Circuit concluded that, as the initial payment did not create an administrative scheme nor impose new requirements on an existing administrative scheme, it did not constitute a plan under ERISA and *Fort Halifax*. Of course, since the continuation of benefits did not alter any existing scheme, it also did not constitute a plan. *Angst* at 1540–1541. *See also Fontenot v. NL Industries*, 953 F.2d 960 (5th Cir.1992); *Wells v. General Motors Corp.*, 881 F.2d 166 (5th Cir.), *reh'g denied*, 887 F.2d 1083 (5th Cir.1989) (table), *cert. denied*, 495 U.S. 923, 110 S.Ct. 1959, 109

---

8. The Court also determined that the statute was not pre-empted by the NLRA, a determination

not material to the instant dispute.

L.Ed.2d 321 (1990) (cases on which Third Circuit relied to conclude that agreement to continue existing benefits does not constitute a separate plan under ERISA).

Defendants also cite *Middleton v. Philadelphia Electric Co.,* 850 F.Supp. 348 (E.D.Pa.1994), in support of their position that the voluntary severance program offered by Osram is not a plan under ERISA. In *Middleton,* the employer offered a severance program which included a lump sum payment of 3 weeks' pay for each year of employment, with a maximum of 18 months' pay, and continuation of certain existing benefits for 18 months. *Id.* at 349. The court reviewed the applicable provisions of ERISA and the holding of *Fort Halifax,* and concluded that the program did not constitute a plan under ERISA. *Id.* at 353–354.

In reaching this conclusion, the court relied heavily on certain factors: there was no new administrative scheme created; once an employee opted to participate in the program, the calculations required were merely clerical or ministerial in nature; the employee could reject the program, so that other options offered during the reorganization were not relevant; and there was no discretionary analysis of eligibility. *Id.* at 353. Authority for each of these considerations is set forth. *Id.* at 352–353, 353 n. 5.

In this case, the terms of the program offered to employees at the Towanda plant of GTE/Osram Sylvania included:

(1) the employee was eligible if he or she met the retirement criteria of either GTE or Osram Sylvania;

(2) severance pay varies with length of employment:

–3 to 9 years: 1½ weeks' pay for each year of service;

–10 to 19 years: 1¾ weeks' pay for each year of service;

–20 or more years: 2 weeks' pay for each year of service;

(3) certain benefits continued through "termination date," while others discontinued as of last day at work.

Amended Complaint, Exhibit 6.

Williamson offers five reasons why this court should reject defendants' argument that the voluntary severance program is not a plan under ERISA. First, Williamson points out that "the voluntary program was developed as part and parcel of a more comprehensive plan to effectuate a work force reduction for all of the facilities acquired by Osram, not just the Towanda plant. Brief in Opposition to Motion for Summary Judgment at 12. We do not consider this relevant, since it is only the benefit to which Williamson would have been entitled that is at issue. Williamson cannot have been deprived of something not offered to him. Moreover, nothing in the program offered indicates that eligibility or administration is dependent on events or benefits offered at other facilities.

In the same vein, Williamson contends that "part of this comprehensive program was an involuntary separation/severance plan which covered employees who were involuntar[il]y terminated 'other than for cause' and was expressly adopted pursuant to and implemented in accordance with ERISA." *Id.* As stated by the court in *Middleton,* considerations of what might happen to employees if they rejected the severance program "is not relevant when considering the *character* of the Plan." 850 F.Supp. at 353 (emphasis in original). It is the voluntary severance program that is at issue, not the overall plan to reduce the workforce (which might entail implementation of an ERISA plan but which cannot itself be considered an ERISA plan). Nor can the voluntary severance program be consider part of the involuntary program, since eligibility is determined differently and the two were implemented separately in time.

Williamson next contends that "Osram decided to leave it to the discretion of each individual facility to decide whether to implement voluntary or involuntary work force reductions, or both, and which employees would be affected thereby." Brief in Opposition to Motion for Summary Judgment at 12. Again, what *could* have been offered is not relevant, as only the benefit which *was* offered can constitute a plan under ERISA. As to the exercise of discretion described, any time that an employer determines what benefit it will offer, it exercises this type of discretion. That there is a process involved

in deciding to offer a particular benefit does not necessarily mean that the benefit will be part of an ERISA plan; the exercise of discretion which will indicate an ERISA plan is in the operation of the plan itself, not in deciding to offer a benefit.

Williamson next contends that "the voluntary plan involved benefits other than just a one-time lump sum severance payment." Brief in Opposition to Motion for Summary Judgment at 12. As recited above, such was the case in *Angst,* and the existence of other benefits does not mean that a severance program is an ERISA plan unless the other benefits require a new administrative scheme or impose new requirements on an existing administrative scheme.

Finally, Williamson points to language set forth in the announcement of the voluntary severance program which was provided to employees, as follows:

> All voluntary separation requests will be subject to Management approval and may or may not be accepted. OSRAM SYLVANIA reserves the right to deny such requests or make special timing arrangements based upon business needs.

Amended Complaint, Exhibit 6 at 1. Despite this language, management at the Towanda facility determined that all eligible employees who requested separation under the voluntary severance program would be accepted, and in fact all were accepted. Finding of Fact 51.

Williamson cites two cases in which benefit programs were found to be ERISA plans and contends that Osram's voluntary severance program is more closely analogous to those plans than to the benefit programs at issue in *Fort Halifax, Angst,* and *Middleton. Pane v. RCA Corp.,* 868 F.2d 631 (3d Cir.1989); *Mullins v. Pfizer, Inc.,* 23 F.3d 663 (2d Cir. 1994).

In *Pane,* the board of directors of RCA identified certain executives to be offered severance agreements, and authorized certain officers to execute and deliver the agreements "with such changes as any such person may deem necessary and advisable ..." 886 F.2d at 634. In other words, the terms of the severance agreements were not definite, but were left to be negotiated with the individual executive targeted for separation. The Third Circuit affirmed the district court's conclusion that this required an administrative scheme. *Id.* at 635. No such circumstances exist in this instance, when the terms of the severance agreement are clear and require only that the individual employee elect to retire.

In *Mullins,* the Second Circuit did *not* find that the program offered by the employer was an ERISA plan. Rather, it remanded to the district court for consideration of whether the benefits offered constituted a plan, as the record was devoid of evidence concerning the terms of any existing plan. The reviewing court could not determine whether the offer was an amendment to an existing ERISA plan or if the new offer required a new administrative scheme with respect to other benefits (besides a one-time lump sum payment) which were part of the offer. Thus, *Mullins* contributes no useful comparison for present purposes.

In sum, then, the voluntary severance program offered by Osram at its Towanda facility was: a one-time lump sum payment, the amount of which was determined by a computation based on objective factors; and a continuation of certain benefits which already existed. No new administrative scheme came into being, and no new responsibility was added to an existing administrative scheme. The Osram program was nearly identical, at least insofar as necessary for present purposes, to the program discussed in *Angst.* Like the Third Circuit in *Angst,* then, we find that the voluntary severance program was not a plan under ERISA, as defined in *Fort Halifax,* and defendants are entitled to summary judgment.

## V. DISPOSITION

Although the motion by defendants is for summary judgment, our determination that the voluntary severance program was not an ERISA plan actually means that the court lacks jurisdiction, the action having been filed premised on ERISA and federal question jurisdiction. Rather than granting judgment in favor of defendants, the appropriate action is to dismiss the case for lack of

subject matter jurisdiction pursuant to Fed. R.Civ.P. 12(h)(3).

However, it is not apparent from the record that Williamson may not bring an action in this court under state law. The dismissal therefore will be without prejudice, and Williamson will be given an opportunity to amend his complaint for that purpose.

An order consistent with this memorandum will issue.