Spears v. SSA                         CV-99-461-JD  07/20/00
             UNITED STATES DISTRICT COURT FOR THE
                   DISTRICT OF NEW HAMPSHIRE


Donna Spears

     v.                                Civil No. 99-461-JD
                                       Opinion No. 2000 DNH 157
Kenneth Apfel, Commissioner
Social Security Administration


                           O R D E R


     The plaintiff, Donna Spears, brings this action pursuant to

42 U.S.C.A. § 405(g), seeking review of the decision of the

Commissioner to deny her claim for social security benefits.  A

previous decision, denying Spears benefits, was remanded to the

Administrative Law Judge ("ALJ") for further consideration of the

evidence and specific findings at the third step of the

sequential evaluation process.[1]  The ALJ again denied her

_____

     [1]  The ALJ is required to make the following five inquiries
when determining if a claimant is disabled:

     (1) whether the claimant is engaged in substantial
     gainful activity;
     (2) whether the claimant has a severe impairment;
     (3) whether the impairment meets or equals a listed
     impairment;
     (4) whether the impairment prevents the claimant from
     performing past relevant work; and
     (5) whether the impairment prevents the claimant from
     doing any other work.

See 20 C.F.R. § 404.1520.

application for benefits, which became the decision of the Commissioner pursuant to 20 C.F.R. §§ 404.984(d) and 416.1484(d). Spears sought judicial review and moves to reverse the decision, and the Commissioner moves to affirm.

## Standard of Review

The court must uphold a final decision of the Commissioner denying benefits unless the decision is based on legal or factual error. See Manso-Pizarro v. Secretary of Health and Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (citing Sullivan v. Hudson, 490 U.S. 877, 885 (1989)). The Commissioner's factual findings are conclusive if based on substantial evidence in the record. See 42 U.S.C.A. § 405(g), § 1383(c)(3). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quotation omitted). The Commissioner's findings are not conclusive "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).[2]  In making the disability determination, "[i]t is

_____

[2]Because the regulations implementing the disability standard for social security insurance benefits, Title II, 42 U.S.C.A. § 423(d), and for supplemental security income, Title XVI, 42 U.S.C.A. § 1382c(a), are the same in all relevant

the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence." Irlanda Ortiz v. Secretary of Health and Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).

## Background

Donna Spears previously worked as a clothing marker, coil winder, and sales clerk, which all required work at the light exertional level. In April of 1996, she applied for disability insurance benefits and supplemental security income, alleging an inability to work due to asthma and psoriasis since January of 1993 when she was thirty-three years old.[3] The ALJ determined, and Spears does not contest, that she met the insured status requirements of Title II of the Social Security Act through June 30, 1994. Her application was denied on March 27, 1997, following a hearing before the ALJ, and after remand, it was

respects, for simplicity, the Title II regulations in Part 404 will be cited for both. See Sullivan v. Zebdley, 493 U.S. 521, 526 n.3 (1990).

[3]Title II of the Social Security Act provides for payment of insurance benefits to applicants whose disability began within the insured period, while Title XVI of the Act provides for the payment of supplemental income to indigent persons who are disabled without regard to insured status. See Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

denied a second time on June 25, 1999, following a second hearing.

The medical evidence in the record shows, and the ALJ found, that Spears has severe impairments caused by asthma and psoriasis. Spears was diagnosed with chronic sinusitis and nasal polyps in August of 1992. She had recurrent breathing episodes including wheezing and was treated in the emergency room in February of 1994. Spears's treating physician, Dr. Gagne, began to treat Spears for asthma in August of 1994.

Spears was treated in the emergency room just after midnight on June 10, 1995, for wheezing and difficulty exhaling and was released after an hour. Dr. Gagne examined her the next day and provided additional nebulizer treatment. Spears experienced wheezing symptoms on June 20, 1995, and Dr. Gagne diagnosed acute asthma on July 3, 1995. She was again treated in the emergency room on July 24, 1995, and after two nebulizer treatments her airflow increased and she was discharged. She continued to experience wheezing. On September 24, 1995, she returned to the emergency room where she was diagnosed with an acute asthmatic attack, acute sinusitis, and bronchitis. She received nebulizer treatment and an anti-inflammatory medication, Solu-Medrol, was administered intravenously. Spears was treated in the emergency room due to wheezing in January, February, May, August, and

4

September of 1996.  Each time she was given nebulizer treatments and during the May treatment, Solu-Medrol was again administered intravenously.  The records from Spears's February 1996 emergency room treatment indicate that she was not taking the asthma medication that had been prescribed for her.

Spears's respiratory condition improved through 1997.  No further reports of emergency room treatments are included in the record.  On October 28, 1998, Spears's treating physician, Dr. Byer, reported that her asthma was considered to be well-controlled by the prescribed medications.

Spears was seen by Dr. Mittelman for a dermatology consultation on January 3, 1992.  Following examination and testing consistent with a diagnosis of psoriasis, Dr. Mittelman began to treat Spears with ultraviolet therapy and then with therapy that combined medication and ultraviolet light, known as PUVA therapy.  By July of 1992, he reported that her condition had improved by more than ninety-five percent.  Spears experienced a skin condition in mid-July of 1992, which the doctors thought was either viral or a reaction to medication, that was treated topically for the next several months.

Dr. Mittelman examined Spears in March of 1993 and found minimal psoriasis.  He reinstituted PUVA therapy for psoriasis and also instructed her to continue to use topical treatments.

By January of 1994, her condition had completely cleared, but she was unable to continue with PUVA maintenance therapy because of transportation problems. In June of 1994, Spears developed a rash due to medication that Dr. Mittelman treated with topical cream and instructed her to avoid sunlight for the next week. He hoped to begin a PUVA maintenance program. By July of 1994, Dr. Mittelman reported that Spears had a reasonably good resolution of her psoriasis with topical therapy although she still had multiple "plaques" of psoriasis. Treatment with Methotrexate was discontinued in November of 1994 due to Spears's adverse reaction including nausea.

Spears continued to receive topical treatment for psoriasis with varying results. In February of 1995 she was happy with her response although she still had a condition that involved her entire scalp and moderate plaques over her trunk and extremities. By June, her scalp was better and she had fewer plaques on her extremities. By January of 1996, however, Dr. Mittelman saw Spears for a dermatology consultation and found that her psoriasis had become more widespread. He restarted Spears on PUVA therapy. In June of 1996, Dr. Mittelman noted that Spears's psoriasis was worsening and that PUVA therapy was not a viable option for her because of her problems with transportation. He tried other treatments but noted in August only slow improvement

6

and that psoriatic plaques covered most of Spears's body. A medical consultant for the State Disability Determination Service, Dr. Campbell, reviewed Spears's medical records and assessed her physical capabilities in a report dated June 6, 1996. Dr. Campbell found that Spears retained the functional capacity to lift or carry ten pounds frequently and twenty pounds occasionally. He wrote that she could walk, stand, or sit for up to six hours in an eight hour work day but could only climb, kneel, crouch, or crawl occasionally. He also recommended that she avoid exposure to extreme heat and airborne irritants.

Dr. Gagne assessed the functional effects of Spears's asthma in January of 1997. He reported that asthma did not affect her ability to lift or carry, to stand, walk, or sit or to perform any postural activities. He recommended that she should avoid temperature extremes, chemicals, dust, fumes, and humidity.

Also in January of 1997, Dr. Mittelman wrote that Spears could not work in a factory because of environmental irritants. He thought she could work as a sales attendant or cashier although her appearance might embarrass her. In October of 1997, Dr. Danby wrote that Spears's skin was too dry and flaky to permit her to have contact with the public. He also said that the nausea caused by Methotrexate would interfere with her concentration and that the time required for transportation for

7

treatments would have an adverse impact on her ability to work.

By June of 1997, Dr. Mittelman reported that Spears was responding very slowly to PUVA therapy. Although Dr. Mittelman hoped for better results from therapy, he said that Spears was unable to work at that time.

Spears began to treat with Dr. Danby for her skin conditions in September of 1997. His records for the period between September 9, 1997, and December 18, 1998, indicate a variety of treatments, and that Spears's psoriasis was stable but remained present. She was again being treated with injections of Methotrexate that caused nausea.

On January 25, 1999, Dr. Danby wrote that Spears's psoriasis condition was unpredictable. He said that she was treated weekly when the condition was acute and every four to six weeks when she was only in maintenance treatments. He also said that she experienced symptoms of pain, dizziness, nausea, and fatigue which would constantly interfere with her ability to pay attention and to concentrate. He said that she could sit more than two hours at a time, could sit for up to six hours in and eight hour day, and could stand for up to four hours. Dr. Danby indicated that Spears would need to shift positions at will and would need breaks of about an hour and a half. He also said that she would likely be absent from work about three times a month.

A hearing on Spears's application was held on January 21, 1997, and after remand, a second hearing was held on January 20, 1999. Spears appeared and testified about her medical history, her treatment, the side effects of her medications, her symptoms, and her functional limitations. She testified that she was essentially housebound during the summer and winter months due to her asthma and arthritis triggered by her psoriasis. Catherine Chandick, a vocational expert, was present and testified at the 1997 hearing. A vocational expert was also present at the 1999 hearing, but he did not testify.

The ALJ determined that Spears had severe impairments due to asthma and psoriasis, but that neither met nor equalled the listed impairments in the regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ found that Spears retained the residual functional capacity for light work that did not include exposure to environmental or chemical irritants or temperature extremes. As a result, the ALJ found that Spears was able to return to her former work as a sales clerk.

Spears added new evidence to the record after the ALJ denied her application in June of 1999, but she decided not to submit her exceptions and the new evidence to the Appeals Council for review. The circuits disagree, and the First Circuit has not addressed the question, as to whether evidence submitted only to

9

the Appeals Council is to be considered as part of the administrative record for judicial review. See <u>Ward v. Commissioner of Social Security</u>, 211 F.3d 652, 657 n.2 (1st Cir. 2000). Since Spears did not seek review by the Appeals Council, the new evidence was never considered at any level of administrative review. For that reason, Spears's new evidence would not warrant review as part of the administrative record even in the circuits where new evidence submitted to the Appeals Council is considered. See <u>O'Dell v. Shalala</u>, 44 F.3d 855, 858-59 (10th Cir. 1994); <u>accord</u> <u>Perez v. Chater</u>, 77 F.3d 41, 45 (2d Cir. 1996). Therefore, the new evidence Spears submitted after the ALJ's decision is not considered as part of the administrative record for judicial review.

<u>Discussion</u>

Spears contends that the Commissioner's decision denying her benefits should be reversed because the ALJ erred in not finding that her asthma met or equalled a listed condition and because the record does not support the ALJ's determination that she retains the residual functional capacity to do her past relevant work as a sales clerk. Spears challenges the ALJ's determinations at the third and fourth steps of the sequential analysis. She bears the burden of showing that she was disabled by her

10

claimed impairment.  See Santiago v. Secretary of Health and Human Servs., 944 F.2d 1, 5 (1st Cir. 1991); Dudley v. Secretary of Health and Human Servs., 816 F.2d 792, 793 (1st Cir. 1987).


A.  Presumption of Disability Based on the Listing of Impairments

A claimant will be presumed to be disabled if her impairment meets or equals the criteria of an impairment listed in 20 C.F.R. 404, Subpart P, Appendix 1.  See Bowen v. Yuckert, 482 U.S. 137, 141 (1987).  Spears contends that her asthma meets or equals the criteria for an impairment due to asthma attacks as listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.03B.  Section 3.03(B) lists asthma attacks as follows:

> Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year.  Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

Attacks of asthma are defined "as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 3.00C.  The medical evidence of asthma attacks "must also include information documenting adherence to a

11

prescribed regimen of treatment as well as a description of physical signs. For asthma, the medical evidence should include spirometric results obtained between attacks that document the presence of baseline airflow obstruction." Id.

Spears refers to asthma episodes in February of 1994, June of 1995, July of 1995, September of 1995, January of 1996, February of 1996, May of 1996, August of 1996, and September of 1996, but does not provide the exact dates of the episodes. Spears offers little affirmative proof to show that she suffered six asthma attacks, as defined in the regulation, during a twelve-month period. With respect to the required length of the attacks, she says that her attacks "presumably started before she went to the hospital and her symptoms did not instantly subside after she was treated there" and refers to records of her care for asthma without any effort to correlate those records with specific asthma episodes. She also cites transcript pages for references that she was "administered therapy treatments" without any discussion of what kind of treatments she received or whether those references are intended to correlate with the particular asthma attacks in the cited months and years. In particular, Spears has not shown, or even argued, that the nebulizer treatments she received meet or equal the requirement in § 3.03B for "prolonged inhalational bronchodilator therapy."

12

Spears cites no other episode within twelve months of the February 1994 episode, and that episode alone does not meet or equal a listed impairment. Since Spears's insured status expired on June 30, 1994, she cannot establish a disability for purposes of Title II benefits based on asthma episodes that occurred after her insured status expired. See 42 U.S.C.A. § 423. Her insured status does not affect her claim for Title XVI benefits so that the remaining episodes are considered in that context.

Several of the episodes cited by Spears appear not to qualify as attacks under the requirements of § 3.03B and § 3.00C. Spears was treated in the emergency room in the early morning of June 10, 1995, after waking up with wheezing and difficulty breathing. She was given respiratory treatment with a nebulizer and was released after about an hour with improved respiratory flow, breathing more easily and feeling better. Dr. Gagne's examination note for later on June 10 indicates that Spears continued to have wheezing but that she was breathing fairly well, had no respiratory distress, and was conversing easily. After a nebulizer treatment in the office, Spears had no wheezing. The short nebulizer treatments she received on June 10 would not appear to constitute "prolonged inhalational bronchodilator therapy," and the episode did not last one or more days as required by § 3.03C.

13

Spears's episodes in July and September of 1995 followed a similar pattern. In July, she received two short nebulizer treatments at the emergency room that improved her breathing although she continued to have faint wheezing. She was treated and released in a period of less than two hours. She saw Dr. Gagne the next day. Dr. Gagne noted that she had poor air movement and wheezing, but Spears declined nebulizer treatment. Similarly, the episodes in January, August, and September of 1996 were treated in three hours or less, and the symptoms do not appear to have lasted for a full day or longer.

In February of 1996, the hospital staff noted that she was not taking medication that was prescribed to treat her asthma, which would preclude that episode from meeting the listing requirements. No episodes are reported after September of 1996. Since Spears has not shown that all of the asthma episodes she experienced between June of 1995 and September of 1996 met or equalled the requirements of § 3.03B, she has not carried her burden of showing that she was disabled due to a listed impairment. The ALJ's determination was therefore not erroneous.

B.  <u>Residual Functional Capacity to Return to Past Work</u>

The ALJ found that despite her psoriasis and asthma, Spears

retained the residual functional capacity to do light work, including standing for six hours in an eight-hour day, with certain environmental limitations.  He also found that her past relevant work as a sales clerk was not precluded by her limitations.  Based on those findings, the ALJ determined at step four of the sequential analysis that Spears was not disabled.

Spears challenges the ALJ's findings on the grounds that the ALJ failed to give proper weight to the opinions of her treating doctors, Dr. Mittelman and Dr. Danby, and to her own testimony with respect to the severity of her psoriasis and the effects of the disease and treatment on her ability to work.  Spears contends that the ALJ failed to properly consider the limitations caused by her psoriasis and the related treatments that were documented in her medical records and described in her own testimony about her daily activities.  As a result, she argues, the ALJ erroneously found she retained the residual functional capacity to return to her past work.

As noted previously, Spears seeks both Title II disability insurance benefits and Title XVI supplemental security income, and her insured status for purposes of Title II benefits expired on June 30, 1994.  Spears has not focused on the extent of her disability during her insured status.  Only one documented treatment for asthma occurred during that period.  The medical

15

evidence indicates that Spears's psoriasis condition was minimally pruritic in March of 1993, and after treatments, had completely cleared by January of 1994. Since Spears has not shown that her doctors' opinions or other evidence indicate that she was disabled prior to June 30, 1994, the ALJ's determination as to Title II benefits is affirmed. The remaining record is considered with respect to Spears's claim for benefits under Title XVI.

As of January of 1997, Dr. Mittelman reported that Spears would be able to work as a sales attendant or a cashier, despite her psoriasis, although the condition might be embarrassing to her. Also in January of 1997, Dr. Gagne assessed the effects of Spears's asthma on her functional capacity and reported that she had no exertional or postural limitations and required only environmental restrictions. At the hearing held on January 21, 1997, the ALJ gave a hypothetical based on an ability to do light work with environmental restrictions and the vocational expert advised that Spears could return to her previous work as a sales attendant or sales clerk, a coil winder, and a marking machine operator. In response to Spears's counsel's added limitation that she could not stand for prolonged periods, the vocational expert eliminated the sales position. Therefore, as of January of 1997, the evidence supports a conclusion that Spears was able

16

to do her prior work and was not disabled.

In June of 1997, however, Dr. Mittelman noted that Spears had widespread psoriasis that was responding very slowly to treatment. He said that he thought she was unable to do any work. Her psoriasis continued, and when Dr. Danby began treatment in September of 1997, he changed her therapy to include Methotrexate. Dr. Mittelman had previously tried Methotrexate and discontinued its use do to the adverse side effects including nausea. Dr. Danby noted in October of 1997 that the Methotrexate made Spears sufficiently nauseated that she would not be able to concentrate on work and that the time required for other treatments would adversely affect her ability to work. Dr. Danby gave the same opinion in January of 1999. Dr. Danby indicated on the form completed on January 25, 1999, that Spears could stand for about four hours and sit for six hours in an eight hour day and would need rest periods during the work day of one and one half hours.[4] Dr. Danby also indicated that she would be likely to be absent more than three times a month.

Despite the doctors' opinions about Spears's condition and

---

[4]Dr. Danby provides no medical reasons why Spears's ability to stand is limited or why he believes she would require an hour and a half of rest each work day. Since the joint statement of material facts does not include any facts as to psoriatic arthritis, Spears's argument that arthritis limits her ability to stand is not supported by the record.

the adverse effects of her treatment after June of 1997 and her own testimony about the time and effects of her treatment, the ALJ disagreed with Dr. Danby's assessment and relied on Dr. Mittelman's earlier opinion given in January of 1997. The ALJ's reasons for discounting Dr. Danby's opinion do not follow the analysis required in 20 C.F.R. § 416.927. In particular, the ALJ gave no reason not to consider the time required for treatment and side effects of the medication being used for Spears's psoriasis. See § 416.929(e)(3).

Most glaring, however, is the ALJ's erroneous statement on page six of his determination. The ALJ wrote: "Given the description of the claimant's past relevant work as a sales clerk, Howard Steinberg, the vocational expert who testified at the hearing, stated that the claimant's maximum sustained residual functional capacity fully conforms to the exertional and nonexertional demands associated with this past work activity." (Emphasis added.) While Steinberg apparently attended the hearing held on January 20, 1999, he did not testify. The ALJ may have mistakenly referred to Steinberg while meaning Chandick, who testified at the 1997 hearing. Since Chandick was not given an opportunity to consider the limitations caused by the side effects of medicine and the time required for treatment that are part of Dr. Danby's opinion, her opinion is not based on an

18

accurate hypothetical question and does not constitute substantial evidence in support of the ALJ's determination.  See Marcotte v. Callahan, 992 F. Supp. 485, 493 (D.N.H. 1997) (citing Arocho v. Secretary of Health and Human Servs., 670 F.2d 374, 375 (1st Cir. 1982)); see also Herron v. Shalala, 19 F.3d 329, 337 (7th Cir. 1994).

Dr. Danby's opinions provide evidence that Spears's residual functional capacity was reduced by the side effects of her treatments for psoriasis after October of 1997.  By January of 1999, Dr. Danby had been Spears's treating physician for a year and a half, and his opinion as to the side effects of Spears's treatment are consistent with her medical records, including Dr. Mittelman's records.  See 20 C.F.R. § 416.927(d).  Since a vocational expert has not considered the availability of jobs Spears could perform with the added limitations caused by adverse side effects and time for treatments, there is no evidence as to whether she could still perform her previous work or whether, at step five, there is other work she could perform.  Therefore, the case must be remanded, once again, for further proceedings on her claim for Title XVI benefits, to resolve whether Spears was disabled due to the side effects of her treatments for psoriasis after October of 1997.

19

## Conclusion

For the foregoing reasons, the Commissioner's motion to affirm (document no. 11) is granted as to the claimant's claim for Title II benefits, but is denied as to her claim for Title XVI benefits. The claimant's motion to reverse (document no. 10) is granted in that the decision of the Commissioner as to her claim for Title XVI benefits is vacated, and the case is remanded pursuant to sentence four of § 405(g) for further proceedings.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

July 20, 2000

cc:  Raymond J. Kelly, Esquire
     David L. Broderick, Esquire

20